No. 12945

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

---

THE STATE OF MONTANA ex rel.,
ANTONIO KOTWICKI,

Relator,

-vs-

THE DISTRICT COURT OF THE FIRST
JUDICIAL DISTRICT et al.,

Respondents.

---

ORIGINAL PROCEEDING:

Counsel of Record:

For Relator:

W. William Leaphart argued, Helena, Montana

For Respondents:

Leif B. Erickson, Jr. argued, Helena, Montana

---

Submitted: January 27, 1975

Decided: MAR - 4 1975

Filed: MAR 4 1975

*Thomas J. Kearney*
Clerk

Mr. Chief Justice James T. Harrison delivered the Opinion of the Court.

This is an original proceeding wherein relator seeks an appropriate writ directed to the district court, Lewis and Clark County, requiring that court to reverse its order of December 4, 1974, denying a motion to suppress the evidence seized by officers from relator's presence on September 25 and 26, 1974.

Counsel for relator was heard ex parte and thereafter an order was issued calling for an adversary hearing and staying all matters until the further order of the Court. Counsel appeared upon the date fixed for the hearing, briefs were filed and respondent court filed a motion to dismiss because relator had adequate relief by appeal. See State ex rel. LaFlesch, ___ Mont. ___, 592 P.2d 1403, 31 St.Rep. 772.

The facts are: An officer of the Montana Highway Patrol was working radar on Interstate highway 15, north of Helena on September 25, 1974, at approximately 9:30 p.m., when a vehicle traveling about 70 m.p.h. was sighted. The officer pursued and stopped the vehicle and advised the driver, relator here, that he had been stopped for driving in excess of the nighttime speed limit. Further that an appearance bond of $15 would have to be posted. The amount is a standard bond in such cases. Relator could not post bond, advising the officer that he was unemployed and his only Montana address was General Delivery, Colstrip. His driver's license was from out of state. Following standard procedure, relator was placed under arrest. Relator then drove his vehicle to the county jail. At the jail, relator was permitted to phone a friend in an effort to post bond. After learning that his friend did not have the money right then and that it would be a while, the deputy sheriff on duty informed relator he would have to be locked up. The deputy sheriff searched relator prior

- 2 -

to placing him in the cell block. In the process the deputy sheriff discovered a small bag of plant-like material in relator's right shoe. The deputy lifted it from the shoe and in placing it on the counter top in the jail receiving area, made the comment: "What do we have here?" The district court found that this comment was made to no one in particular. However, relator, thinking the remark had been made to him, responded by answering "Marijuana." Shortly thereafter relator was placed in the cell block and then brought back and for the first time, advised of his rights under the Miranda decision.

Later that evening a deputy county attorney advised relator of his rights with respect to a search of his vehicle and requested a waiver of those rights and a consent to search. Although relator at one point stated, "you might just as well look in it, it's full of marijuana", he subsequently revoked his consent. The next morning relator was again asked by the deputy county attorney to consent to a search and in such conversation was advised that in any event a search warrant would be obtained. At that time relator signed a permission to search. The search was thereafter conducted and the items seized are the subject of the motion to suppress.

Relator contends (1) that his custodial arrest for exceeding the speed limit violates the Fourth Amendment to the United States Constitution and Art. II, Sec.11 of the Montana Constitution; (2) that his custodial arrest as a result of not having sufficient funds to post the appearance bond violates the equal protection clause of the Fourteenth Amendment to the United States Constitution; (3) that all evidence was either identified or derived from police questions asked in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L Ed 2d 694, and (4) that his consent to the search was not "voluntary"

under the standard established in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L Ed 2d 854.

Relator's custodial arrest for exceeding the speed limit did not violate the Fourth Amendment to the United States Constitution nor Art. II, Section 11, of the Montana Constitution. In pertinent part, the Fourth Amendment reads:

> "The right of the people to be secure in their persons * * * against unreasonable * * * seizures, shall not be violated * * *."

The Montana Constitution reads:

> "The people shall be secure in their persons * * * from unreasonable * * * seizures."

Under these constitutional provisions, we must inquire into whether relator's custodial arrest was reasonable under the particular circumstances of this case. We hold that it was. Upon stopping relator, the highway patrolman learned these facts: relator possessed an Arizona driver's license; relator was unemployed; the only address relator could give was "General Delivery, Colstrip"; and, while Colstrip is in Rosebud County, relator was driving a car licensed in Big Horn County. It is common knowledge that Colstrip is today a boom town, a construction town, with nearly the entire population transient. Given these facts, it was reasonable for the highway patrolman to believe that relator was a transient, unlikely to return and pay the fine if he was allowed to drive on down the road without having posted an appearance bond.

The highway patrolman was clearly within his rights when he directed relator to proceed to the county jail and directed his incarceration. Section 31-112, R.C.M. 1947, empowers a patrolman, upon making an arrest, to deliver the offender: (1) to the nearest justice of the peace, during office hours; or (2) to the county jail, or (3) deliver a summons to the offender, or (4) accept a deposit for appearance. In addition, the Montana Highway

- 4 -

Patrol Manual directs patrolmen to refrain from allowing out of state "violators to proceed without first setting and accepting an appearance bond". Even if it be conceded that relator was not an "out of state violator", where the circumstances are such that the violator does not have the cash for the appearance bond on his person, it is not during office hours for the justices of the peace, and it is unlikely that the violator will honor a summons, the patrolman properly exercised his discretion in delivering relator to the county jail.

Relator contends that a reasonable alternative to the booking and jailing of relator would have been to allow relator to wait in the lobby until his friend arrived with the bond money. Even conceding the patrolman had nothing better to do than to watch relator, there was nothing at that time to assure the patrolman that relator's friend would show up in the half hour or forty-five minutes in which he did. The patrolman quite possibly might have had to watch over relator for an hour or two and still had to book and jail relator if his friend never showed up. This uncertain "babysitting" is unreasonable.

Relator concedes the state has an interest in collecting fines for speeding violations. However, relator does not present any viable alternative to taking the offender into custody, which would ensure the collection of these fines when the circumstances are such that the offender is unlikely to return and pay the fine. Relator's arrest was an arrest for a traffic offense. It was not an arrest for a crime involving moral turpitude, which arrest in itself might blemish his future. That being the case, we hold the state's interest in the collection of this fine outweighed the relator's interest in being free from this custodial arrest.

Neither does relator's custodial arrest for exceeding

the speed limit violate the equal protection clause of the Fourteenth Amendment of the United States Constitution. Relator contends first that he was only taken into custody when it became apparent that he did not have sufficient funds to post the bond; that he was, in effect, arrested for not carrying money. Relator relies on Williams v. Illinois, 399 U.S. 235, 240, 241, 243, 244; 90 S.Ct. 2018, 36 L Ed 2d 586, wherein the court concluded:

> " * * * when the aggregate imprisonment exceeds the maximum period fixed by the statute and results directly from an involuntary nonpayment of a fine or court costs we are confronted with an impermissible discrimination that rests on ability to pay * * *."

He further relies on Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L Ed 2d 130, 133, wherein the Court adopted the view of four members of the Court in Morris v. Schoonfield, 399 U.S. 508, 90 S.Ct. 2232, 26 L Ed 2d 773, by stating:

> "' * * * the Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.'"

Relator's argument is that, although the $15 is technically an appearance bond, in practice it is the actual fine. Rather than appear, violators forfeit the bond and the matter is dropped. Section 32-21-157, R.C.M. 1947, provides the state has the option of punishing a traffic offender with a fine or with imprisonment, but not both. As such, relator argues, under Tate, when the patrolman opted to issue a summons to appear, he chose to fine the relator and was thereby precluded from incarcerating him.

However, the instant case is distinguishable from those cited by relator on at least three grounds. First, the cases cited by relator involve the conversion of sentences received from that of fine to imprisonment. Here, we are involved not with a

- 6 -

judicially imposed sentence but with an appearnce bond designed to prevent the offender from entirely escaping punishment. Second, the cases cited by relator involved incarceration in excess of statutory limits. No such claim is made here. Third, each case cited by relator involves the indigency of the defendant whereby he is unable to pay the fine. Here, there is no claim made that relator was so indigent he could not pay the $15 bond, merely that he did not have the cash in his pocket. Indeed, he was driving a new 1974 automobile.

We hold that this case is not within the rationale of Williams, Tate or Morris. The United States Supreme Court specifically stated in Williams:

" * * * We have no occasion to reach the question whether a State is precluded in any other circumstances from holding an indigent accountable for a fine by use of a penal sanction * * *."

The Court in Williams also anticipated the problem inherent in its decision if applied to other fact situations, such as the case at hand, when it stated:

"The State is not powerless to enforce judgments against those financially unable to pay a fine; indeed, a different result would amount to inverse discrimination since it would enable an indigent to avoid both the fine and imprisonment for nonpayment whereas other defendants must always suffer one or the other conviction."

When the facts are such as to reasonably indicate to the patrolman that the offender is unlikely to return and pay the fine, the state must have the power to either take the offender into custody or to require an appearance bond in order to be assured the offender will suffer some punishment. We have previously disposed of relator's contention that he should have been allowed to wait in the lobby until his friend arrived with the bond money. To have allowed relator to have proceeded on his way simply because he did not have $15 in his pocket would have resulted in the "inverse discrimination" condemned by the

- 7 -

United States Supreme Court since another offender under like circumstances <u>with</u> $15 in his pocket would have had to post bond, whereas relator quite possibly could have escaped punishment altogether merely by leaving the state.

The circumstances of this arrest could have happened to anyone--rich or poor. Relator's incarceration was not the result of a denial of equal protection based upon indigency, but, from the facts, was the result of being within the class of persons unlikely to return and pay the fine. Were the logic of relator to be followed through, then anyone unable to post any kind of a bond would have to be immediately released because the bond was discriminatory against him. Instead, bond is required to assure the appearance of the accused at court. This is a legitimate purpose which has been upheld and needs no further comment.

Relator's second equal protection argument is that he was not treated the same as other individuals in precisely the same situation. Officer Kessner, who picked up relator, testified that during the period from January 1974 to September 1974 he had stopped approximately twenty motorists for exceeding the night speed limit who were not able to post bond on the spot. Of those approximately twenty motorists, five were brought into the sheriff's office until they could come up with the money. Four of these five obtained the money within a "very short period of time". Only one person, other than relator, was incarcerated because he was unable to post bond. Relator had the burden of proof to show that he was in essentially the same situation as the four persons taken to the sheriff's office who were not booked and jailed, but did come up with the money within a "very short period of time". Relator has not sustained his burden. Relator merely points to four persons who were not booked and jailed, but with no attempt to find out whether he was in essentially the same

- 8 -

situation. There was no attempt to find out how long "a very short period of time" was, and whether relator's friend arrived within that time. In addition, relator's counsel cut off the testimony of Officer Kessner which might have answered the question as to why relator was booked and jailed when the other four were not:

> "Q. Is it normal procedure to put them in jail if they can't post bond? While they are even waiting for someone to come and post bond for them? A. No, I don't book them until--

> "Q. Do you have any departmental guidelines as to when and when not you should take somebody into custody for a speeding ticket? A. Yes, sir, I do."

The "departmental guidelines" referred to, direct highway patrolmen to refrain from allowing out of state "violators to proceed without first setting and accepting an appearance bond". The guidelines do not explain whether a violator should be booked and jailed.

Having determined that relator's custodial arrest was valid, it follows that the search of relator's person was also valid. United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L Ed 2d 427; Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L Ed 2d 456.

We find relator's third contention, that all evidence was either identified or derived from police questions asked in violation of Miranda, to be without merit. Relator contends the deputy's question, "What do we have here?" was asked prior to relator being given the Miranda warning and thus relator's answer, "Marijuana", and the bag of marijuana should be suppressed. In no event should this reasoning require the suppression of the bag found in relator's shoe. That bag was discovered pursuant to a valid search, prior to any statements relator made. Neither should relator's spontaneous answer be suppressed. A reading of

Miranda indicates that it applies to "interrogation" of the
defendant.  In this case, there was no interrogation.  The
district court found the question of the deputy was not directed
to anyone in particular.

Finally, we hold that relator's consent to the search
of his car was "voluntary" under the standard established in
Schneckloth.  Relator contends the circumstances surrounding
his consent to search point toward coercion:  On the night of
his arrest, he had refused to consent to the search of his car;
he consented only after having spent a night in jail; he con-
sented only after having been informed by a deputy county attor-
ney that a search warrant could be obtained regardless of his
consent; and, his consent was obtained while he was in custody.
Schneckloth held that voluntariness is to be determined from
the "totality of the circumstances".  In addition to the circum-
stances noted by relator, the record shows relator signed a
written "Permission to Search" which recited:

> "I, Ramon Kotwicki, have been informed * * * of
> my CONSTITUTIONAL RIGHT not to have a search
> made of the premises and property owned by me
> and/or under my care, custody and control, with-
> out a search warrant.
>
> "Knowing of my lawful right to refuse to consent
> to such a search, I willingly give my permission
> * * *."

While relator would use the night spent in jail to show invol-
untariness, it was a night in which relator might reflect on
the fact that he had already told the deputy county attorney
"you might just as well look in it, it's full of Marijunana." Also,
relator had previously, in March 1974, been arrested for criminal
possession of dangerous drugs and had, at that time, been fully
advised of his rights for purposes of that proceeding.  We hold,
as did the district court, that under the "totality of circum-
stances" present here relator's consent to search his car was

- 10 -

voluntary.

Finding no error, the order of the district court is affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

- 11 -