THE STATE OF MONTANA, PETITIONER, *v.* THE DISTRICT COURT OF THE EIGHTH JUDICIAL DISTRICT OF THE STATE OF MONTANA, IN AND FOR THE COUNTY OF CASCADE, DEFENDANT.

No. 14153.
Submitted March 17, 1978.
Decided April 18, 1978.
577 P.2d 849.

J. Fred Bourdeau, County Atty., Great Falls, for petitioner.

Howard F. Strausse and James A. Lewis, Mark Bauer, Great Falls, for defendants.

MR. JUSTICE DALY delivered the opinion of the Court.

On December 8, 1977, the Cascade County attorney's office applied to this Court seeking a writ of supervisory control upon these facts:

On June 23, 1976, defendant Thomas Staplkemper was arrested at his home for the shooting of a Great Falls police officer. During the arrest various articles were seized and statements were made.

Defense counsel made a pretrial motion to suppress all evidence seized at the defendant's home and all statements made during the arrest. The District Court, Cascade County, held a hearing on the motion to suppress on November 25, 1977. On December 5, 1977, the District Court issued an order suppressing all evidence obtained at the defendant's apartment, including all statements of Frank Vieira, and all statements by defendant prior to appointment of counsel. It is from this December 5 order that relief is sought. This Court held an adversary hearing on January 17, 1978. On January 18, this Court issued an order which provided in pertinent part:

"2. The application of the State of Montana for a writ of supervisory control or other appropriate writ or order is denied. * * *

"3. That this order and judgment is entered without prejudice to the State's right of appeal from the order suppressing evidence by the District Court of Cascade County, dated December 5, 1977 * * *."

The State, appellant herein, filed a motion of January 30, 1978, seeking to have this Court consider the merits of the case. The motion was granted. The Court accepted transfer of the District Court record; the transcript of the suppression hearing before the District Court; the briefs by the State and defendant on the application for writ of supervisory control; and the oral arguments at that time; as the record, briefs and oral argument on appeal by the State of Montana from the District Court order granting defendant's motion to suppress. The matter was deemed submitted to this Court for consideration March 17, 1978.

The issue on appeal is whether the District Court erred in granting defendant's motion to suppress on December 5, 1977.

The facts leading to the suppression hearing are: On June 23, 1976, Thomas Stapelkemper and his stepbrother, Frank Vieira, went to the Buttrey supermarket where they stole a can of spray paint. The brothers then went to Chowan Spring Park where they began sniffing paint. After a period of time, the brothers argued and began physically fighting with one another. This fighting was witnessed by several children who proceeded to a nearby store and

requested the clerk to notify the police. At approximately 1:15 p.m., Police Officer Gerald Davidson answered the disturbance call. He followed the children from the store to the wooded area in Chowan Springs Park. After proceeding about 50 feet into the wooded are, he heard a voice say *"behind you"*. Turning he saw a young man standing on the path he had just taken. He approached the young man and when he was about 20 feet from him, the officer inquired what the problem was. At that point the young man raised his right hand, in which he had a gun, and shot Officer Davidson in the chest without warning. As he fell to the ground, his hat fell over his face. As he lay there, the assailant approached and fired another shot at the head of the policeman. Davidson heard the shot and felt the earth next to his face splash on him. At this point, he decided to "play dead". The assailant then ran to the officer's patrol car, but the keys were not in the ignition. He returned to the wounded officer's patrol car, but the keys were not in the ignition. He returned to the wounded officer and asked where "the god-damned keys" were and left the area.

Immediately after the youth left, Davidson notified other officers of his injury by portable radio. As they arrived and waited for an ambulance, Davidson gave them a brief description of the person who shot him. As more officers arrived on the screen, they questioned persons in the area and obtained a further description of a possible assailant.

The descriptions were updated as more information was gathered and passed along to officers in the investigation. The basic description given was: The first suspect was approximately 16 years old, 6 feet tall, wearing a long yellow sweatshirt. The second suspect had reddish-blonde, long, shaggy hair, approximately 16, 5 feet 10 inches tall, 135 pounds, light colored jacket, brown or tan, and possibly blue jeans. Witnesses said the suspects had paint and mud all over their clothes and faces.

Based upon this information, the police began an investigation. It included visits to the residences of persons possibly involved, as well as a plea to people in the area to report any evidence they

might have. Officer Robert Jones of the Great Falls police depart-
ment, juvenile division, was directly involved in these operations
because of his knowledge of know juvenile paint sniffers and of-
fenders in the Great Falls area. Officer Jones knew of several
juveniles he felt fit the descriptions he received and the description
and circumstances of the offense indicated Thomas Stapelkemper
was a likely suspect. After attempting to locate another youth who
also fit the description obtained, Jones and Captain Joseph Guza,
also of the juvenile division, began looking for Tom Stapelkemper
and his stepbrother Frank Vieira to question them in regard to this
incident. They went to two possible addresses before arriving at
812 Second Avenue North in Great Falls. This building is a four-
plex apartment unit. The Stapelkemper residence is located on the
top floor on the right hand side. To reach it the officers went up the
stairs in a common hallway. At the top of the stairs in the hallway
is a bathroom which the occupants of the upper two apartments
share.

Jones and Guza arrived at approximately 3:00 p.m. They went
up the stairs to the right and approached the Stapelkemper apart-
ment. When they arrived at the door it was three-quarters open and
they could see into the kitchen table several feet from the door was
Frank Vieira. A hair dryer was in his hand and blowing. As ex-
pressed by Officer Jones, the officers entered the apartment to see if
Vieira was all right, as they could not determine from outside if he
was injured and in need of help.

As Officer Jones got to him, Frank Vieira awoke and appeared to
be all right. The two officers noticed near the table a pile of clothes
covered with mud and gold paint. The information they received
indicated the assailant of Officer Davidson had been sniffing gold
paint and was covered with mud from his fist fight with the other
person involved. Officer Jones then asked Vieira where he had
been, who he had been with, and who shot the police officer. The
answers Vieira gave indicated his brother was the person the police
were seeking. Vieira further informed the officers his stepbrother
Thomas Stapelkemper was in the bathroom the officers passed by

on their way to the apartment. At this time the weapon used in the assault had not been located. Officers Jones and Guza were the only officers at the apartment.

After Officer Jones talked to Frank Vieira, he radioed for assistance, which arrived within three to four minutes. Officers Myron Lee and Timothy Skinner were among the first officers to arrive. When they arrived, Jones was talking to Stapelkemper through the bathroom door. After a brief period, Stapelkemper came out and surrendered to Officer Jones.

When he came out from the bathroom, Stapelkemper was given his *Miranda* rights and without questioning was placed in a patrol car to be taken to the Great Falls police department.

While enroute to the police department, Stapelkemper volunteered the statement which implicated him in the shooting. The officers were specifically directed not to question him during the transport and they did not. His remarks were unsolicited.

Stapelkemper's mother Bonnie Barksdale was advised of the situation and was also taken to the Great Falls police department. There, both Stapelkemper and his mother signed a waiver of rights (Stapelkemper signed both a juvenile and an adult waiver of rights as he was 17 years and 10 months old at that time) after conferring with his mother in private for some time.

After the initial arrest, Frank Vieira gave a statement to the police at the residence which further implicated Stapelkemper. Vieira was transported to the Great Falls police department, where his statement was transcribed.

After the waiver of rights was signed by Stapelkemper and his mother, he made admissions and remarks which allowed the police, in connection with other information they had independently obtained, to locate certain evidence, including the gun used in the assault. Without the statements of defendant, the evidence may not have been found. Also, after all occupants of the apartment had gone to the police station, evidence was collected from the apartment by the officers left behind, without a warrant.

It was admitted at the suppression hearing that at the time the of-

ficers entered the Stapelkemper apartment they had only a suspicion defendant and Vieira were involved in the shooting. At the time the officers reached the door of the apartment, they had no probable cause for either an arrest or a search of the apartment. The District Court held this was an unauthorized entry with no probable cause and therefore any evidence obtained during that entry was suppressed as being illegally obtained, including the statements made by Frank Vieira after being awakened in his own residence by police officers and questioned.

Section 95-701, R.C.M.1947, states:

"A search of a person, object or place may be made and instruments, articles or things may be seized in accordance with the provisions of this chapter when the search is made:

"(a) As an incident to a lawful arrest.

"(b) With the consent of the accused or of any other person who is lawfully in possession of the object or place to be searched, or who is believed upon reasonable cause to be in such lawful possession by the person making the search.

"(c) By the authority of a valid search warrant.

"(d) Under the authority and within the scope of a right of lawful inspection granted by law."

■ Section 95-701(d) is controlling for the officers had prior justification for their presence in the defendant's apartment. While engaged in a general investigation, the officers came upon what appeared to be a person in distress. The detective had a legitimate reason for entering the apartment unconnected with a search.

■ The Fourth Amendment to the United States Constitution prohibits only "unreasonable searches". A warrant has never been thought to be an absolute requirement for a constitutionality proper search. Searches, whether with or without a warrant, are to be judged by whether they are reasonable, and, reasonableness varies with the circumstances of the search. *Henry v. United States*, (1959), 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134; *Brinegar v. United States*, (1949), 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879.

■ We hold the police action here was reasonable. The Fourth Amendment does not require police officers to delay in the course of an investigation, if to do so would endanger their lives or the lives of others. It is apparent that we are not here confronted with a situation which can be characterized as a "hot pursuit". The entry was effected nearly two hours after the attempted murder, and the police officers were not in actual pursuit of any suspect.

■ Despite the inapplicability of the "hot pursuit" doctrine, this Court nevertheless is of the opinion that the circumstances were sufficiently exigent to justify an entry of the premises. "A warrantless entry of a dwelling is constitutionally permissible where the officers' conduct is prompted by the motive of preserving the life and reasonably appears to be necessary for that purpose." *People v. Hill* (1974), 12 Cal.3d 731, 117 Cal.Rptr. 393, 411, 528 P.2d 1, 19. See: *People v. Superior Court* (1970), 6 Cal.App.3d 379, 85 Cal.Rptr. 803; *People v. Gomez* (1964), 220 Cal.App.2d 781, 40 Cal.Rptr. 616.

In this case, the door was open and a young man fitting the description of one of the suspects was slumped over a table in the middle of the afternoon. From the officers' vantage point, they had no idea whether the youth was asleep, unconscious from a possible attack, blacked-out from paint sniffing, or dead. The officers entered the room to ascertain whether the youth was all right. Once inside, they noticed a pile of muddy, paint covered clothes lying on the floor in plain view.

■ It is well settled that this Court on appeal presumed the correctness of the District Court's order. It is the burden of appellant to overcome such a presumption. *State ex rel. Stephens v. District Court* (1976), 170 Mont. 22, 550 P.2d 385; *State ex rel. Elakovich v. Zbitnoff* (1963), 142 Mont. 576, 386 P.2d 343. The State has borne its burden of demonstrating the existence of circumstances which justified entry into residence.

After defendant was arrested, he was transported to the Great Falls police department. While in the police car, defendant made certain admissions which the District Court suppressed. From the

suppression hearing record, it is clear the alleged admissions were unsolicited by the police officers transporting defendant, and defendant was given his *Miranda* warning prior to making these admissions. Therefore the admissions were not the result of "custodial interrogation". *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. The United States Supreme Court in *Miranda* noted:

"* * * By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. * * *" 384 U.S. 444, 86 S.Ct. 1612.

Defendant had been deprived of his freedom of action, but had not been questioned by law enforcement officers when he voluntarily made the statement. This was an admission against interest, not made under interrogation.

In the instant case, defendant, who was a youth, could not have been interrogated without counsel, but it should be noted that *Miranda* applies only to custodial interrogation and not to voluntary, spontaneous statements made by a defendant, not in response to any interrogation. *State ex rel. Kotwicki v. District Court* (1975), 166 Mont. 335, 344, 532 P.2d 694.

After defendant was taken to the police department, both he and his mother signed documents entitled: "ACKNOWLEDGMENT OF ADVISEMENT OF CONSTITUTIONAL RIGHTS OF YOUTH" and "YOUR RIGHTS—WAIVER". After signing these documents, defendant made certain statements to members of the police department, before talking to an attorney. An examination of the documents signed by defendant and his mother shows these documents do not contain any language which adequately explains the defendant's rights under the Montana Youth Court Act.

Section 10-1218(3), R.C.M.1947, states in pertinent part:

"* * * Neither the youth nor his parent or guardian may waive counsel if commitment to a state correctional facility or to the department of institutions for a period of more than 6 months may result from adjudication."

Similarly, section 95-1002, R.C.M.1947, states:

"A defendant may waive his right to counsel except that in all felony cases where the defendant is under eighteen (18) years of age the defendant shall be represented by counsel at every state of the proceedings."

These sections indicate that even if the parent and the defendant agree, they may not waive the defendant's right to counsel under certain circumstances. Therefore, at the time defendant *was questioned*, after his arrest, he had an absolute right to be represented by counsel and neither he nor his parents could waive that right. Since counsel was not present at the time defendant was questioned, those statements were correctly suppressed.

After defendant was arrested he could not waive his right to remain silent and submit to interrogation by the authorities without the advice of counsel. The rationale behind this rule is apparent. One under the age of 18 years might be incapable of understanding his constitutional rights and likewise might be incapable of understanding the consequences of giving up those constitutional rights. It is also true the youth's interests and the interests of his parents might conflict, therefore a parent may not waive the right for the person under the age of 18 years.

The judgment of the District Court is reversed except for the suppression of the evidence obtained at the police station under the void waiver of rights and as to this evidence, the District Court is affirmed.

MR. CHIEF JUSTICE HASWELL and MR. JUSTICE HARRISON concur.