No.  90-123

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA,

        Plaintiff and Respondent,

   -vs-

JOHN DESKINS,

        Defendant and Appellant.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Edward P. McLean, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Howard Toole, Missoula, Montana

        For Respondent:

        Hon. Marc Racicot, Attorney General, Helena, Montana
James Yellowtail, Assistant Attorney General, Helena, Montana
Robert Deschamps, III, County Attorney, Missoula, Montana

Submitted on Briefs:  July 13, 1990

Decided:  October 24, 1990

Filed:

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Defendant and appellant, John Deskins, was charged in the District Court of the Fourth Judicial District, Missoula County, on June 23, 1989, with the offense of criminal possession of dangerous drugs with intent to sell. He appeals the denial of his motion to suppress the results of a search by Missoula City Police pursuant to a May 25, 1989 search warrant issued by District Court Judge Jack L. Green. We affirm.

The only issue before this Court is whether the District Court erred in failing to grant the appellant's motion to suppress.

On May 23, 1989, Missoula City Police Officer Vincent Sparacino received a Crimestoppers' report from an anonymous caller. The caller stated that he had been taken into the basement of a greenhouse located at 600 or 602 South Avenue East in Missoula, and had been shown a marijuana growing operation. Officer Sparacino arranged to have the caller contact the Narcotics Unit the next day. The following day, May 24, 1989, Missoula Police Detective Rocky Harris received a Crimestoppers' report regarding the same marijuana growing operation. The caller identified himself as the same caller who had talked to Officer Sparacino the previous day.

As a result, Detective Harris contacted the county assessor's office and verified that the owners of the property on South Avenue East were John and Nancy Deskins. He also contacted the treasurer's office to confirm the issuance of the resident licence to Nancy Deskins for the operation of a day care facility on the

2

property and to check names of the registered owners of the vehicles parked on the property. The vehicles on the property were registered to Mr. and Mrs. Deskins. When Detective Harris checked with the Montana Power Company to substantiate the registered names for the utility service to the two addresses, the registration revealed the name of John Deskins.

Based upon the knowledge that marijuana cultivation operations often consume a significant amount of electricity, Detective Harris obtained an investigative subpoena to gain access to the records of the electrical consumption at the Deskins' property. These records for the residential portion of the Deskins' property (600 South Avenue East) showed the power consumption for the residential half of the duplex as follows:

| Interval | Kilowatt Hours Consumed |
|---|---|
| 9/26/88 - 10/25/88 | 378 KWH |
| 10/25/88 - 10/31/88 | 81 KWH |
| 10/31/88 - 11/22/88 | 298 KWH |
| 11/22/88 - 11/30/88 | 148 KWH |
| 11/30/88 - 12/21/88 | 390 KWH |
| 12/21/88 - 1/20/89 | 494 KWH |
| 1/20/89 - 2/21/89 | 421 KWH |
| 2/21/89 - 3/22/89 | 525 KWH |
| 3/22/89 - 3/31/89 | 167 KWH |
| 3/31/89 - 4/20/89 | 371 KWH |
| 4/20/89 - 5/22/89 | 1567 KWH |

Electrical consumption records for the other portion of the property, the day care at 602 South Avenue East, revealed the following:

| Interval | Kilowatt Hours Consumed |
|---|---|
| 9/26/88 - 10/25/88 | 931 KWH |
| 10/25/88 - 10/31/88 | 176 KWH |
| 10/31/88 - 11/22/88 | 645 KWH |
| 11/22/88 - 11/30/88 | 300 KWH |

3

| | |
|---|---|
| 11/30/88 - 12/21/88 | 787 KWH |
| 12/21/88 - 1/20/89 | 1364 KWH |
| 1/20/89 - 2/21/89 | 1442 KWH |
| 2/21/89 - 3/22/89 | 1035 KWH |
| 3/22/89 - 3/31/89 | 276 KWH |
| 3/31/89 - 4/20/89 | 612 KWH |
| 4/20/89 - 5/22/89 | 901 KWH |

Detective Harris, who has had extensive training in narcotics investigations and knowledge pertaining to electrical power consumption for average household usage and for a typical marijuana cultivation operation, testified that from his training and experience the Deskins' electrical consumption records reflected a cyclical use of power that was not explained seasonally. Detective Harris concluded that the Deskins' electrical consumption records were consistent with the Crimestoppers caller's observation of the marijuana cultivation operation, and as a result he prepared an application for a search warrant of the property.

On May 25, 1989, pursuant to a search warrant issued by District Court Judge Jack L. Green, members of the Missoula Police Department conducted a search of the duplex located at 600 and 602 South Avenue East owned by the appellant and his wife. The search revealed a large quantity of marijuana, 250 marijuana plants, and equipment used in the cultivation of marijuana, namely sodium grow lamps, fans, and scales.

In addition to the marijuana plants and equipment, the following firearms were also taken pursuant to the May 25, 1989, search: a loaded Fox .12 gauge shotgun; an H & K SL .223 rifle with a loaded magazine; a Western Field single shot .22; a Ruger Mini 14 with a loaded magazine; a Wards Western Shotgun, loaded; a Chief

4

Special revolver .38 caliber, loaded; and a Game Getter antique pistol, loaded.

On June 23, 1989, the appellant was charged in Missoula County District Court with the offense of criminal possession of dangerous drugs with intent to sell. On August 23, 1989, the appellant filed a motion to suppress the results of the May 25, 1989, search, alleging insufficient probable cause for the issuance of the search warrant.

The suppression hearing was held August 24, 1989. At the suppression hearing, Officer Sparacino's record of the Crimestoppers' call of May 23, 1989, was admitted into evidence. In addition, Detective Harris testified at the hearing regarding the substance of his conversation with the Crimestoppers caller. The person called stating he had seen a marijuana growing operation in the residence of Morgan Deskins. The person said that there were two other individuals living there, the father and the mother, John and Nancy Deskins, and that this residence also housed a day care. Furthermore, the person was personally shown this operation.

Detective Harris also testified the caller stated that the marijuana was grown in two-and-one-half or three-month cycles and that the caller had seen growing marijuana plants in the Deskins' residence a month previously. The caller also told Harris that "there were fluorescent sodium lamps hanging over the plants."

It should be noted that the search warrant application indicated that the electrical consumption records obtained by Harris were presented to the reviewing judge in conjunction with

5

the actual application. However, at the time of the hearing on the motion to suppress, no such records were present with the search warrant application in the District Court's file. While the appellant alleges that the reviewing judge had only the "conclusive allegations" of the applicants with respect to the information conveyed by the foregoing records, this is contradicted by the fact that the application contained a synopsis of the electrical records.

Following the denial of the motion to suppress the evidence seized, the appellant entered a plea of guilty to the offense, and the matter is now presented to us on the question of the validity of the search.

The appellant in his argument notes that under the provisions of § 46-13-302(4), MCA, the burden of proving the illegality of a search and seizure is upon a defendant. State v. Baldwin (Mont. 1990), 789 P.2d 1215, 1220, 47 St.Rep. 614, 620. In Baldwin, this Court held that there is a presumption that a magistrate properly issued the search warrant after subjecting the application to the totality of the circumstances test set forth in Illinois v. Gates (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527.

We have previously held in State v. District Court of the Eighth Judicial District (1978), 176 Mont. 257, 264, 577 P.2d 843, 859 and State v. Lane (1977), 175 Mont. 225, 236, 573 P.2d 198, 202, that a judicial decision granting a search warrant is presumed correct on appeal.

In addition, in State v. Hembd (1989), 235 Mont. 361, 767 P.2d

6

864, this Court held that "[t]he reviewing court's examination is limited to whether the magistrate had a substantial basis for concluding probable cause existed." Hembd, 235 Mont. at 366, 767 P.2d at 868. We have noted that the determination of probable cause is entitled to "great deference" from a reviewing court. Sundberg, 235 Mont. at 123, 765 P.2d at 741.

The probable cause requirement sufficiently establishes a probability rather than a prima facie case "that incriminating items, namely items reasonably believed to be connected with criminal behavior, are located on the property to which entry is sought." Sundberg, 235 Mont. at 119, 765 P.2d at 739. "That probability will be determined using a totality of the circumstances analysis, based upon the circumstances set forth in the affidavit." Hembd, 235 at 366, 767 P.2d at 867 (citation omitted). Following Illinois v. Gates, this Court has held that information in the form of an anonymous tip from an informant whose reliability is established by independent corroboration may serve to establish probable cause.

> We note in passing, however, that the use of anonymous tips as an element in obtaining a search warrant has been sustained by the United States Supreme Court in Illinois v. Gates (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, and by the Montana Supreme Court in State v. Kelly (1983), 668 P.2d 1032, 40 St.Rep. 1400, where other corroborating evidence is shown.

State v. Cain (1986), 220 Mont. 509, 515, 717 P.2d 15, 19.

In the present case, the search warrant application recites the informant's statement that he had been in the appellant's

7

basement one month previously at the invitation of the appellant's son and personally observed growing marijuana plants. Personal observation of criminal activity by an informant whose reliability can be established provides probable cause. State v. Walston (1989), 236 Mont. 218, 222-23, 768 P.2d 1387, 1390.

We find that, clearly, there was a substantial basis for the District Court's conclusion that probable cause was "readily ascertainable."

The appellant attempts to undermine the showing of probable cause by citing a number of so-called inconsistencies in the evidence. First, the appellant alleges that the State has a burden to inform the reviewing magistrate of any criminal history on the part of the suspect when applying for a search warrant, and because he had no criminal history, the State fell short of its burden when applying for the search warrant. However, appellant cites no authority for the proposition.

Secondly, appellant cites an alleged inconsistency in the informant's tip. The search warrant application stated the informant had been on the Deskins' property thirty days before he contacted the law enforcement authorities. The testimony of Officer Sparacino indicated the informant had been on the premises "a couple of days earlier." The appellant now points to this discrepancy as error. The State explains the inconsistency as merely a lack of recollection. Because Officer Sparacino did not, at the time of the informant's call, document the date and time when the informant claimed to have been on the Deskins' property,

Officer Sparacino had no record of that date to refer to when testifying three months later. We find this alleged inconsistency without merit.

We find, after carefully considering the case authority in this matter, that the arguments of the appellant are without merit and the judgment of the District Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

9

Justice R. C. McDonough respectfully dissents.

The search of the Deskins' home does not comply with the policies which are articulated in the Fourth Amendment to the United States Constitution and the right to be free from unreasonable searches (Article II, Section 11), and the right of privacy (Article II, Section 10) embodied in the Constitution of the State of Montana. For this reason, I would reverse.

The policies embodied in the above Amendment and articles grew directly out of events which immediately preceded the revolutionary struggle with England. Due to their experience with unrestrained search and seizure by means of automatic issuance of writs of assistance, the colonists viewed the prohibition of unreasonable searches and seizures of utmost importance. As a result, after the signing of the Declaration of Independence, at least eight states included such prohibitions in their constitutions. Perry and Cooper Sources of Our Liberties (1959). Eventually the federal government followed this lead through its enactment and the states' ratification of the Bill of Rights.

These freedoms should not be lost by the exigencies of our times. The right to be free from unreasonable search and seizure is of paramount importance to a free society. Following his return from the Nuremberg trials Justice Jackson observed:

> [Fourth Amendment rights] are not mere second class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and

10

most effective weapons in the arsenal of every arbitrary
government . . .

See Almeida-Sanchez v. United States (1973), 413 U.S. 266, 37
L.Ed.2d 596, 93 S.Ct. 2535 citing Brinegar v. United States (1948),
338 U.S. 160, 180, 93 L.Ed. 1879, 1893, 69 S.Ct. 1302, 1313
(Jackson dissenting).

Consistent with these sentiments, the framers of our State
Constitution have prohibited state officials from conducting
unreasonable searches and seizures of property. This prohibition
is contained in Article II, Section 11 of the Montana Constitution.
It states:

> The people shall be secure in their persons, papers,
> homes and effects from unreasonable searches and
> seizures. No warrant to search any place, or seize any
> person or thing shall issue without describing the place
> to be searched or the person or thing to be seized or
> without probable cause, supported by oath or affirmation
> reduced to writing.

As this article indicates, government officials must apply to
the courts for permission to search a person's property. Before
this permission can be granted, the judiciary must determine
whether there is probable cause to believe that evidence of illegal
activity will be found in the place to be searched. Courts have
spent a great deal of time attempting to formulate a test which can
be utilized in probable cause determinations. The United States
Supreme Court, in Illinois v. Gates (1983), 462 U.S. 213, 76
L.Ed.2d 527, 103 S.Ct. 2317, has adopted a totality-of-the-
circumstances test.

According to this test, a reviewing magistrate need only make
a common sense decision whether, given all the circumstances set

11

forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. Therefore, if from a review of the totality of the circumstances it reasonably appears that criminal evidence is present at the locale to be searched, a search warrant could legally be issued. Gates, 462 U.S. at 238. Following the Gates decision, this Court followed federal lead and adopted the same totality of the circumstances approach. State v. Kelly (1983), 205 Mont. 417, 668 P.2d 1032.

Many commentators, fellow judges and legal scholars have expressed strong disagreement with the principles set forth in Gates. Justice Byron White for example, while concurring in the outcome of the Gates case, disagreed with the majority's decision to adopt the totality of the circumstances test. He expressed concern that utilization of the totality of the circumstances test would result in "an evisceration of the probable cause standard." Gates, 462 U.S. at 272 (White concurring).

The case now before us proves Justice White to be correct. Gates is a step backward in the development of any set of coherent rules to deal with information supplied by an informant. As stated in Gates, "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238.

The Gates decision, however, fails to adequately define or limit the term "practical, common-sense decision." Utilization of this broad standard has rendered probable cause determinations involving hearsay information, essentially subjective. Through their use of this "common-sense" approach, the courts have turned probable cause determinations into an art form which is not based on any reason or rule of law. For this same reason appellate review of search warrant decisions is difficult, because there are no real standards of review, except the appellate judge's view of "practical common sense." Due to the use of such a subjective test, inconsistencies between magistrates and reviewing trial courts are sure to arise and the application of common law will be thwarted.

Previous to the Gates decision, the courts used the two-prong Aguilar-Spinelli test when making probable cause determinations. See Aguilar v. Texas (1964) 12 L.Ed.2d 723, 378 U.S. 108, 12 L.Ed.2d 723, 84 S.Ct. 1509; Spinelli v. United States (1969), 393 U.S. 410, 21 L.Ed.2d 637, 89 S.Ct. 584. As the previous paragraphs indicate, probable cause is an innocuous concept which involves legal intricacies as well as everyday common sense. In recognition of this concept, the courts have sought to develop a set of coherent rules governing a magistrate's consideration of warrant applications and the showings that are necessary to support a finding of probable cause. Gates, 462 U.S. at 275 (Brennan dissenting). In my view this goal is well served by renewed adherance to the two-pronged Aguilar-Spinelli test.

This test requires the police, when relying upon hearsay information provided by an informant, to establish two elements before obtaining a search warrant. First, the police must establish some basis to reasonably believe crime evidence will be found at the locale to be searched. Second, the police must provide facts which establish either the veracity of their informant or alternatively the reliability of the informant's report. Aguilar, 378 U.S. at 114, Spinelli, 393 U.S. at 413. Each element must be established; they are independent and separate requirements. If one is not established, probable cause would not exist on the basis of information received from an informant. Very strong evidence relative to one test does not overcome the deficiencies involved in the other test.

It is important to realize, however, that the two prongs of Aguilar-Spinelli need only be met when the police are relying upon evidence obtained through an informant. Therefore, when they rely upon facts which are directly discovered through investigation, the police need not present further information which establishes credibility or veracity. In these situations, the police need only establish the first prong of Aguilar-Spinelli which requires that they present facts which support the reasonable conclusion that incriminating evidence will be found in the place to be searched. Holley, The Decline of the Right to Privacy and Security; Gates and the States - The First Three Years (1988) 21 Creighton L.Rev. 823.

When the police rely upon hearsay information however, they must also satisfy the second prong of Aguilar-Spinelli. This

14

requirement is necessitated by the recognition that hearsay information obtained from an informant is often times untrustworthy. See State v. Gommenginger (1990), 47 St.Rep. 681, 790 P.2d 455 citing Fletcher v. United States (D.C. Cir. 1946), 158 F.2d 321. In order to ensure that search warrants are not obtained through reliance upon false information or unfounded rumors, the Aguilar-Spinelli rule requires the police to establish the credibility of their informant or the veracity of his information. Spinelli, 393 U.S. at 416.

This requirement serves a second purpose when applied to anonymous tips. By definition nothing is known about an anonymous informant's identity, honesty or reliability. The courts should not, therefore, blindly accept conclusory allegations from such sources or attach any presumption to their information. Gates, 462 U.S. at 284 (Brennan dissenting). Such allegations, submitted by police officers, who are considered presumptively reliable, cannot form the basis for probable cause. Therefore, the courts should not accept the same type of conclusion from anonymous informants when nothing is known concerning their reliability.

The first prong of the test, can often be satisfied if the informant's tip contains sufficient detail describing the accused's criminal activity. Such detail might assure the magistrate that he is relying "on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." Spinelli, 393 U.S. at 416. See also Draper v. United States (1959), 358 U.S. 307, 31 L.Ed.2d 327,

79 S.Ct. 329. Of course, this portion of the test can also be satisfied through a clear explanation of how the informant came across his knowledge concerning the alleged criminal behavior. Stanley v. State (Md. 1974), 313 A.2d 847, 861.

The second prong of the Aguilar-Spinelli rule can be satisfied through statements by an officer informing the magistrate of the informant's reliability. Often this is accomplished by showing that the information obtained from the informant was against his penal interests or that the informant has been proven reliable in the past. LaFaue, Search and Seizure (1978) Volume 1 § 3.3(c). The second prong can also be met by establishing the veracity of the informant's allegations. This can be accomplished through corroboration of details of the tip by further investigation. See Gates, 462 U.S. at 283 (Brennan dissenting). Such corroboration can help establish the reliability of the source. If law enforcement can establish that an informant is right about some things, it is generally safe to conclude that "he is right about other facts, usually critical, unverified facts." See Spinelli, 393 U.S. at 427 (White concurring).

Through application of this test to the case now before us, it is apparent that sufficient probable cause does not exist and the search of the Deskins' home was unreasonable. The investigating officer in this case had three basic facts which were incorporated in his affidavit for a search warrant. According to the majority opinion, the officer received an anonymous tip from an informant who stated he had seen a marijuana growing operation

16

in the basement of a house located at 600 or 602 South Avenue East. The informant further stated that the house was owned by John and Nancy Deskins. The police officer verified the fact that the house was owned by the Deskins. The officer also, through a review of electrical records, concluded that the Deskins were engaged in a marijuana growing operation. This conclusion was based upon the fact that the Deskins' use of electricity fluctuated.

To begin the analysis we must address the first prong of the test, which requires an inquiry into the facts and circumstances that combine to form a basis for the anonymous informant's belief that the Deskins' basement contained a marijuana growing operation. In making this inquiry, we must restrict our analysis to the four corners of the search warrant. State v. Hembd (1989), 235 Mont. 361, 767 P.2d 864.

According to the search warrant affidavit, the anonymous tipster told officials of the Missoula police department that he personally viewed a marijuana growing operation in the Deskins' home. According to the tip, the operation was located in the basement which was equipped with florescent lights. The plants were grown on a two and one-half month cycle.

The first prong of the Aguilar-Spinelli test can be satisfied by a statement from the informant that he personally observed the criminal activity. See Spinelli, 393 U.S. at 416. Such personal observation occurred in this case and therefore the first prong of the test is satisfied.

The information contained in the affidavit fails to meet the

17

requirements of the second prong, however. This portion of the test requires that the police show either that the informant is credible or that his information is reliable. This case involves an anonymous tip. Therefore, the police obviously cannot establish the informant's credibility. Instead they must establish the veracity of his information.

The Missoula police officers sought to accomplish this task by verifying that the Deskins lived where the informant said they did and by obtaining electrical records. The fact that the Deskins lived at 600 South Avenue East is an innocent fact. It does nothing to establish any allegation regarding illegal activity. Moreover, the electrical records in and of themselves do not establish the probability that the Deskins illegally grew marijuana.

Supported by further evidence, electric records are invaluable in detecting illegal activity. However, by themselves they do not provide adequate information to establish probable cause. See e.g. State v. Huft (Wash. 1986), 720 P.2d 838, State v. Mason (Idaho 1986), 728 P.2d 1325. This fact is especially evident in the case now before us. The informant told Missoula police officers that the Deskins had been growing marijuana for five years. Despite this allegation the police officers only included power records for the period between September of 1988 until May of 1989 in their application for a warrant. During this nine month period, records indicate that in the residential portion of their home, the Deskins' power usage approximated 378 KWH during the months of late

September through late November of 1988. Their usage rose to 538 KWH during the time period between November 22 through December 21, 1988. During the months of late December through late March, the power records reveal that the Deskins' usage ranged from a low of 421 KWH, to a high of 525 KWH. This use rose dramatically between April 20, 1989 and May 22, 1989, to a rate of 1567 KWH.

Examination of records from the day care portion of the Deskins' property revealed similar information. During the fall months, the Deskins utilized an average of 876 KWH of electricity per month. This power usage increased steadily throughout the winter months to a high of 1442 KWH during January and February of 1989. During the spring months, the electricity records reveal that the power usage once again approximated 900 KWH, which was close to that recorded during September and October of the previous year.

With the possible exception of the high rate recorded in April and May of 1989 for the residential portion of the property, these records are not indicative of any illegal activity. On the contrary, the records indicate a normal utilization of electrical power. For both the home and the day care center, the power usage increased throughout the fall and winter months and then began to decline during the spring.

The Missoula police stated in their affidavit that the high rate recorded in April and May indicated the beginning of a marijuana growth cycle. However, this high rate was recorded over only one month. According to the informant, the Deskins had grown

marijuana for five years. This one month period does not establish any pattern which may have been revealed through a review of power records gathered from a longer period of time. Furthermore, it is highly doubtful that increased use of electricity during one month can form the basis to verify an anonymous tip such as received here.

The affidavit for the search warrant failed to establish probable cause, as determined under the Aguilar-Spinelli test, because the police did not sufficiently verify the information obtained through the anonymous tip. Moreover, the results of this case illustrate the problems inherent in the totality of the circumstances test. Armed with only an anonymous tip and a high rate of electricity recorded over only a one month period, the police obtained a warrant and searched a citizen's home. The authors of our state constitution sought to prevent such occurrences through inclusions in our state constitution granting Montana citizens a right to privacy and a right to be free from unreasonable searches and seizures.

Although we are constrained by the minimal protections afforded by the federal constitution, we may construe the rights enumerated in our state constitution as affording additional liberties to those granted by the United States Supreme Court. The State of Alaska rejected completely the totality of the circumstances test on the basis that its constitutional provisions granting a right against unreasonable searches and seizures and a right to privacy, mandated stronger protection. State v. Jones

(Alaska 1985), 706 P.2d 317. The detailed reasoning set forth by the Alaska Supreme Court is compelling. I believe it should be adopted by this Court, given the fact that the Montana Constitution contains provisions similar to those of the Alaska Constitution.

The judgment should be vacated and the results of the search suppressed.

_____
Justice

Justices William E. Hunt, Sr. and John C. Sheehy concur in the foregoing dissent.

_____
Justices

21