No. 82-178

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

_____

STATE OF MONTANA,

          Plaintiff and Respondent,

   -vs-

JAMES KELLY,

          Defendant and Appellant.

_____

APPEAL FROM:  District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Joseph B. Gary, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Anderson, Edwards & Molloy; Richard W. Anderson argued
Billings, Montana

    For Respondent:

        Mike Greely, Attorney General, Helena, Montana
Sarah Power argued, Asst. Atty. General, Helena
A. Michael Salvagni, County Attorney, Bozeman,
Montana: Robert Throssell, Deputy County Atty.

_____

Submitted:  May 26, 1983

Decided:  August 29, 1983

Filed: AUG 29 1983

*Ethel M. Harrison*

_____
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Defendant appeals from a conviction of criminal possession of dangerous drugs with intent to sell, following trial without jury in the Eighteenth Judicial District Court, Gallatin County. We affirm.

Defendant raises the following issues:

1. Were the searches in Hawaii illegal and was evidence seized as a result of those searches tainted?

2. Was the opening of the package by the Bozeman police, and their inventory of its contents, an unconstitutional search and an invasion of defendant's right of privacy?

3. Did the issuing magistrate in Montana lack jurisdiction to issue the first search warrant?

4. Was the affidavit of probable cause for the first search warrant fatally defective:

    a. Did probable cause exist for its issuance?

    b. Did hearsay information supporting its issuance render it fatally defective?

5. Did the "offense" upon which the first affidavit was based result from entrapment, rendering the issuance of the first search warrant improper?

On April 2, 1981, a federal agricultural inspector (Baba) in Honolulu, conducting warrantless searches of United Parcel Service (UPS) packages for plants, pests and diseases under the authority of federal law, opened a box containing what he suspected might be plants, fruits or similar items. His suspicion was based upon the method of packaging, the weight and wrapping of, and the addresses on the package. The package was addressed to defendant with a return address subsequently determined to be fictitious. He observed bricks of a pressed substance in plastic bags, one of which he

2

opened and smelled an odor unlike marijuana he had smelled before. Baba then phoned Honolulu Police Officer Hisatake whom he knew from previous work they had done together, and who was on airport narcotics duty. Then Baba left the open package on the UPS conveyor in care of the UPS manager. Approximately half an hour later, Officer Hisatake arrived at the UPS depot and without a warrant, field-tested the slabs of greenish substance packed beneath a newspaper and some paperback books. The slabs were identified as marijuana in the form of hashish. Hisatake retained about two pounds of the substance for further lab testing. The next day he phoned Sgt. Green of the Bozeman Police Department; the officers agreed the UPS parcel should be mailed to the Bozeman Police by Air Freight. This was done. The box arrived in Bozeman April 5th (Sunday). The next day, pursuant to telephone instructions from federal drug control officials but without a warrant, Sgt. Green opened the box and inventoried and tested the contents of the unsealed UPS package addressed to defendant. The box contained about nine pounds of hashish. Green then rewrapped and resealed the UPS box. On April 7, the Bozeman UPS Manager, at Green's request, delivered the package to the address on the box, the Fox Street residence of defendant. Officers observed the delivery, then Sgt. Green returned to a magistrate's office, where he signed a previously-prepared affidavit describing the delivery, and requested a search warrant for the Fox Street house. The search warrant was granted; officers returned and searched the house. Defendant, his wife and a second man were present, as was a quantity of hashish (valued at approximately $275,000) and a variety of paraphernalia -- scales, baggies (some filled with hashish), and the unopened UPS box. The officers arrested all three inhabitants.

3

Leaving the home under police surveillance, Sgt. Green returned to the magistrate with an application for another search warrant, based upon the unanticipated evidence uncovered during the first search of defendant's home. The second search warrant was issued. The evidence was photographed, seized and conveyed to the police labs and evidence lockers, where it remained until hearing and trial.

Defendants moved for suppression of all evidence. In the course of an extensive suppression hearing, all motions were denied. Just before trial, defendant's wife pleaded guilty. Apparently the charges against the second man were dismissed. Defendant waived his right to a jury trial. The suppression hearing transcript was a stipulated part of the trial transcript. The parties also stipulated that all contraband seized was taken pursuant to the two search warrants. The court found defendant guilty of possession of dangerous drugs with intent to sell. Defendant appeals, alleging that the District Court erred in refusing to suppress tainted evidence which was the fruit of several improper searches.

Defendant first argues that the warrantless searches and seizure of the UPS box in Hawaii violated the United States Constitution and the Plant Pest Acts because Baba searched the box without probable cause and Hisatake searched and seized the box without a warrant. He maintains that because all subsequent discoveries and seizures were tainted by illegal procedure in Hawaii and should have been suppressed, his conviction must be overturned. We do not agree.

Let us first consider whether Inspector Baba improperly searched the UPS package without a warrant. Baba was acting pursuant to the provisions of the Federal Plant Pest Acts, 7 U.S.C.A. §§147a-167 and the Hawaiian and Territorial

4

Quarantine Act, 7 C.F.R. §318. These Acts provide for the warrantless inspection of "any persons or means of conveyance" moving into the United States, upon probable cause to believe they are carrying or are infested with plant pests or plant diseases.

In Camara v. Municipal Court (1967), 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930, the Supreme Court struck down the warrantless administrative search of buildings for housing, health and fire code violations, holding that, in most situations, administrative searches without warrants are improper. But Camara noted that warrantless administrative searches could be reasonable under some circumstances. In United States v. Schafer (9th Cir. 1972) 461 F.2d 856, the Circuit Court of Appeals explained why upholding a warrantless inspection under the Plant Pest Acts was not inconsistent with Camara. Schafer involved the search by airline officials of the handbag of a passenger boarding a plane bound from Hawaii to the United States. We find the rationale persuasive here.

> "In [Camara], the Court concluded that requiring building inspectors to obtain search warrants imposed no hardship on the conduct of their mission. There was 'no compelling urgency to inspect at a particular time or on a particular day,' [387 U.S. at 539, 87 S.Ct. at 1736] as the property to be searched was a building, obviously not a thing susceptible to speedy removal. Here, however, the time element is a major consideration. The objects of the search (quarantined fruits, vegetables and plants) can easily be transported out of Hawaii to the continental United States by departing tourists. The effect of such movement on agricultural crops in the mainland states could be serious as each of the quarantined items may carry some form of plant disease or insect which could destroy crops in the other areas. The purpose of the quarantine is to avoid these effects by preventing the movement of the potentially dangerous plant substances. We think a search warrant requirement would 'frustrate' the purpose of these inspections, because of the time delays inherent in the search warrant mechanism. Unless all departing passengers could be detained while warrants could be obtained, the goods would be

moved before the warrants could issue. Whereas in Camara there was no suggestion that 'fire, health, and housing code inspection programs could not achieve their goals within the confines of a reasonable search warrant requirement.' [387 U.S. at 533, 87 S.Ct. at 1733] we are persuaded that requiring warrants for agricultural inspections of this type would effectively cripple any meaningful quarantine." Schafer, 461 F.2d at 858.

Under the administrative search principles articulated in Camara, and the principles in See v. City of Seattle (1967), 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943, and the numerous progeny of those two landmark cases, a government official would be entitled to search a package without a warrant where there was a significant public protection involved, the intrusion was minimal, the goal was not discovery of a crime, and the governmental purpose would be otherwise thwarted or rendered impracticable by requiring a search warrant. All of these elements are present, making Baba's search a reasonable administrative search.

Defendant argues that regardless of the exigencies of the situation, Baba acted without probable cause to believe this particular package contained plant pests or diseases. The probable cause requirement relative to administrative searches is less stringent than that relative to criminal investigations and "[i]f a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." Camara, 387 U.S. at 539, 87 S.Ct. at 1736, 18 L.Ed.2d at 941. See also Marshall v. Barlows, Inc. (1978), 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305. The State argues that "[h]ere, where the warrant requirement is vitiated by the necessity and urgency of immediate inspection, probable cause exists and a valid public interest justifies the intrusion." The State relies upon another 9th Circuit decision, upholding screening

6

of airline passengers for weapons and explosives, which recognized that:

> "...[S]earches conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime, may be permissible under the Fourth Amendment <u>though not supported by a showing of probable cause directed to a particular place or person to be searched.</u>" United States v. Davis (9th Cir. 1973), 482 F.2d 893, 908 (emphasis added).

Moreover, although Baba characterized his search as "random" at trial, his testimony established that he searched only parcels which were unusually heavy and sent by individuals to individuals (as opposed to businesses, etc.). In his experience, those parcels were more likely to contain plants carrying pests or diseases. Thus his search was not a random search but was directed at parcels which by their packaging were more likely to contain items with disease or insects. This, along with the compelling need to find and interrupt the shipment of infested parcels, is sufficient to establish the probable cause contemplated by the Plant Pest Acts.

Defendant next argues that, even if Baba's search of the UPS box was reasonable, Hisatake's subsequent warrantless search and seizure of the box was a violation of Fourth Amendment guarantees. Since Baba had already interrupted UPS's delivery of the package, defendant argues that the exigencies which justified Baba's warrantless search no longer applied, and Hisatake should have obtained a warrant.

We reject this argument. <u>Baba</u>, not Hisatake, seized the UPS package legitimately under the "plain view" rule, which permits warrantless seizure of evidence of crime inadvertently discovered by police in the course of a valid search. Coolidge v. New Hampshire (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. In his exhaustive study of the

7

requirements of the Fourth Amendment, Professor Wayne LaFave summarizes the <u>Coolidge</u> plain view rule:

> "[T]he plain view doctrine discussed in <u>Coolidge</u> is intended to provide a basis for making a <u>seizure</u> without a warrant. The fact that there is a plain view in the <u>Coolidge</u> sense does not mean that there has been no search; indeed, the situations described by Justice Stewart are in the main search situations--search pursuant to a warrant naming other objects, search during hot pursuit, search incident to arrest, and a search for purposes other than finding evidence. Rather, the effort in <u>Coolidge</u> is to describe when items so found may be seized even though they were not the items which were legitimate objectives of that search. The <u>Coolidge</u> plurality identifies three requirements: (1) there must be a prior valid intrusion; (2) the discovery of the seized items must be inadvertent; and (3) it must be immediately apparent to the police that they have evidence before them." W. LaFave, SEARCH AND SEIZURE, §2.2(a) at 241-42 (1978).

The Supreme Court's recent decision, Texas v. Brown, No. 81-419 (U.S. April 19, 1983), reiterates the rule that "if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately." Slip opinion at 8. <u>Brown</u> also relaxes rule (3) stated above. Where under <u>Coolidge</u>, it must be "immediately apparent to the police that they have evidence before them," under <u>Brown</u>, probable cause to support a warrantless seizure of evidence in plain view is supplied by "[a] 'practical, nontechnical' probability that incriminating evidence is involved." Slip opinion at 11.

Baba's conclusion that the contents of the UPS box were marijuana was sufficient under <u>Brown</u> to justify seizure. He was a plant inspector for the Department of Agriculture. Moreover, although Baba was not technically a "police officer," he was a government official acting pursuant to federal law in seizing unauthorized plant substances uncovered by his search.

We hold that Baba's search was a valid administrative search pursuant to standards articulated in Camara and Schafer, and his seizure of the UPS box and its contents pursuant to federal statutes and the plain view rule discussed in Coolidge and Brown, did not violate defendant's Fourth Amendment rights.

In Brown, the Supreme Court also stated:

"[W]hen a police officer has observed an object in 'plain view,' the owner's remaining interests in the object are merely those of possession and ownership." Slip opinion at 7-8.

In other words, once Baba had recognized and seized the UPS box and its contents, defendant had no further grounds for claiming that any reasonable expectation of privacy in them was offended by either Hisatake's inspection and testing of the box's contents or Sgt. Green's further inspection and testing in Bozeman. The Constitution requires that, before the initial search and seizure, the "deliberate impartial judgment of a judicial officer . . . be interposed between the citizen and the police." Katz v. United States (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. It does not require that a magistrate's judgment be interposed between every transfer of evidence between officers or between law enforcement agencies once the evidence has been legitimately seized. Such a requirement would be absurd and would imply a continued privacy interest in the defendant after valid seizure of incriminating evidence.

In United States v. Andrews (10th Cir. 1980), 618 F.2d 646, the Circuit Court of Appeals considered whether, after a controlled delivery, a federal drug enforcement agent was required to secure a search warrant before reopening the package containing cocaine at the delivery point. The package, bound for Denver, had been opened by a suspecting

9

cargo supervisor for Continental Air Cargo Service in Miami and field-tested by detectives the supervisor called. The detectives removed some of the cocaine, resealed the package and sent it to Denver on a Continental flight. In Denver, an alerted Drug Enforcement Administration (DEA) official took custody of the package and placed it in a Continental freight vault overnight. Wearing a freight clerk's uniform, he released the package the next morning to the defendant, who was arrested by DEA officials. The agent regained custody of the package and returned to the DEA office, where he opened it and removed the cocaine. The trial court granted defendant's motion to suppress. The Circuit Court of Appeals reversed, holding that:

> "[T]he police seizure [in Miami] was made upon probable cause and under exigent circumstances. Thus, the shipment of the package to Denver, its delivery over to Andrews there, and its subsequent taking away from Andrews were . . . actions constituting . . . 'official dominion continued unbroken because close surveillance followed the seized contraband, insuring that it remain within official possession.'" 618 F.2d at 654.

See also United States v. Ford (10th Cir. 1975), 525 F.2d 1308. In both Ford and Andrews, where the initial seizure was legitimate, controlled delivery by private carrier and resumption of custody after delivery was held to amount to continued "official dominion," so that it was not necessary to obtain a search warrant before the container was regained and opened by officials after delivery.

In Andrews and Ford, the initial search was private and, under applicable law, did not involve the Fourth Amendment as it would have in Montana. In this case, the initial search and seizure in Hawaii was valid under Camara and Coolidge and did not offend the Fourth Amendment. In all three cases,

10

government dominion over evidence was legitimately obtained and effectively continued during a controlled delivery, and there was no need to procure warrants for each successive exercise of custody and inspection of the evidence. Indeed, here a search warrant was obtained after delivery; in Ford and Andrews, the defendant and contraband were seized without warrants, shortly after delivery.

We hold that, since Baba's administrative search and seizure did not violate the Fourth Amendment, no privacy interest of defendant was violated by Hisatake's inspection in Honolulu or Green's later inspection in Bozeman. Thus, the procedures in Hawaii, and the inspection by Green in Bozeman, do not require suppression of the evidence obtained by the Bozeman searches.

Our conclusion as to this issue also resolves the second issue raised by defendant. Because government dominion over the box "continued unbroken" for all reasonable purposes, from its valid seizure by Baba in Hawaii to its delivery in Bozeman and during that period of dominion, the box could be inspected without a warrant.

Defendant's third issue is that the magistrate who issued the first search warrant in Montana lacked jurisdiction to do so, because the affidavit established that any criminal activity began and ended in Hawaii.

It is true that a justice court's criminal jurisdiction is limited under section 3-10-303, MCA, to crimes committed in its county. It is also true that under section 46-1-201(7), MCA, the offenses stated in the affidavit must be violations of the laws of this state or its political subdivisions. Obviously, if the only crime alleged had been committed in Hawaii, the Montana magistrate would have been without jurisdiction to issue a warrant.

11

We hold there is no jurisdictional question here. The affidavit did not explicitly name the offense, but the facts stated clearly indicated that the suspected offense was possession of dangerous drugs which is a violation of Montana law under Title 45, Chapter 9, MCA. The affidavit stated that the suspected offense took place in Bozeman, Gallatin County. Thus, it was within the magistrate's jurisdiction. Whether the magistrate's decision to issue the warrant was correct goes to probable cause, not jurisdiction.

The fourth issue raised by defendant is whether the affidavit supporting the first search warrant was so defective that the evidence uncovered and seized pursuant to that warrant was inadmissible at trial.

Defendant argues that the affidavit failed to show that an offense had been committed because it did not show that he "knowingly" possessed the hashish -- only that he voluntarily accepted a UPS package. Section 46-5-202, MCA, requires that an affidavit state that an offense has been committed, and that it state facts sufficient to show probable cause for issuance of the warrant.

It is well-settled that the evidence sufficient to establish probable cause for a warrant is significantly less than that required to support a conviction. All that need be shown is "a probability of criminal conduct." State v. McKenzie (1978), 177 Mont. 280, 290, 581 P.2d 1205, 1211. That rigid, technical standards are inappropriate to probable cause determinations is also evident from the United States Supreme Court's language in the recent case of Illinois v. Gates, No. 81-430, slip op. at 19-20 (U.S. June 8, 1983):

> "As early as Locke v. United States, 7 Cranch. 339, 348 (1813), Chief Justice Marshall observed ... that 'the term "probable cause," according to its usual acceptation, means less than evidence which would justify condemnation-.-.-.. It imports a

12

seizure made under circumstances which warrant suspicion.' More recently, we said that 'the quanta-.-.-.-of proof' appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. Brinegar, supra, 338 U.S., at 173. Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to 'probable cause' may not be helpful, it is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' Spinelli, supra, 393 U.S., at 419. See Model Code of Pre-Arraignment Procedure §210.1(7) (Proposed Off. Draft 1972); W. LaFave, Search and Seizure, §3.2(3) (1978)."

Here, the affidavit established that "hashish, a controlled substance," had been discovered in a UPS warehouse in Hawaii addressed to defendant in Bozeman, and that, after a controlled delivery, he had accepted the parcel from UPS in Bozeman. The affidavit established the possession by defendant of a controlled substance in Gallatin County. That it did not establish "knowing" possession is not fatal to the affidavit. It is true that without evidence that defendant knowingly possessed the hashish, there was insufficient evidence to convict him. State v. Smith (1983), _____ Mont. _____, _____ P.2d _____, 40 St. Rep. 494. There was, however, sufficient information to provide probable cause. That the box contained hashish was indisputably established, both in Hawaii and Bozeman. It was addressed to defendant. Possession of hashish is illegal in Montana. The box containing the hashish had been accepted by a male at the Fox Street address and was still inside his Fox Street residence.

Defendant stresses the behavior of the police in "orchestrating" the delivery to him, arguing that he could not possibly have known the contents of the UPS box. But if government officials had not seized the box and controlled the delivery, but had discovered its contents some other way

and had merely observed the uninterrupted delivery by the UPS, defendant's knowledge or lack of knowledge of the contents of the box would have been no different. In either case, defendant accepted a UPS box with hashish in it. Whether or not he was the "unsuspecting recipient" of a parcel of hashish addressed to him by persons unknown, as he claims, is a question for the fact finder at trial, not to be passed upon by the issuing magistrate.

In this case, of course, the first search warrant uncovered far more than enough evidence, apart from the contents of the UPS box, to convict defendant of possession with intent to sell. Thus, it was unnecessary for the fact finder to determine whether or not defendant was aware of the UPS box's contents. That is not dispositive here. Clearly, if there was probable cause for the first Bozeman search, the second (warranted) search and seizure was also legitimate and the evidence obtained was properly admitted.

We hold that the affidavit's failure to expressly name the crime alleged and its failure to prove that defendant knew the UPS box's contents did not invalidate the search warrant. The information included in the affidavit was sufficient to be considered a statement that an offense had been committed and to provide probable cause for the search warrant to issue.

Defendant argues that the affidavit was fatally defective because it did not include the date the offense occurred. In State ex rel. Townsend v. District Court (1975), 168 Mont. 357, 361-62, 543 P.2d 193, 195-96, we stated: "[A]n affidavit which omits a reference to the time of the criminal event cannot establish probable cause . . .. The time factor is regarded as an important element of

14

probable cause in order to prevent the issuance of warrants on 'loose, vague, or doubtful bases of fact . . ..' "

We find no merit in this argument. In Townsend, no reference was made to time. Here, the affidavit shows that the delivery was at 12:10 P.M., on either April 6 or April 7, 1981. The package had not been removed from the Fox Street house. This small error does not create such a doubtful basis of fact as to defeat the affidavit.

Defendant maintains that it was improper for the State to have prepared the affidavit before the UPS delivered the box to Kelly. It indicated that the State knew the delivery would occur, having prearranged it. Thus the State in effect caused the crime to occur. We do not find defendant's argument persuasive for two reasons. First, it is more pertinent to the issue of entrapment than to defects in the affidavit or the warrant. Second, there is nothing inherently wrong in drawing up an affidavit in anticipation of an expected illegal act. It is a convenient way to obtain a search warrant immediately after the offense occurs. Nor are we persuaded by defendant's repeated assertions that the State caused the possession to happen. The State merely controlled the UPS delivery, which would have occurred in any event. Such a controlled delivery has been upheld in Andrews and Ford.

Defendant's final challenge to the sufficiency of the affidavit is that it included hearsay and double hearsay which formed the basis for a finding of probable cause without satisfying the tests articulated in Aguilar v. Texas (1964), 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 and Spinelli v. United States (1969), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637, as set forth in Townsend, 168 Mont. 357, 360, 543 P.2d 193, 195-96:

15

"It cannot be disputed that hearsay information may be considered to establish probable cause. State v. Paulson, 167 Mont. 310, 538 P.2d 339, 32 St.Rep. 786; Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, 739; Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327. But when hearsay information forms the justification for a finding of probable cause and the issuance of a search warrant, the two-pronged test set out in Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723, must be applied and satisfied:

"'* * * the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887, was "credible" or his information "reliable." '

"See also: Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637."

See also Thomson v. Onstad (1979), 182 Mont. 119, 594 P.2d 1137.

The State properly notes that while the facts in the affidavit pertaining to the Hawaiian portion of events are hearsay, the package in question and the drugs at issue were seen and dealt with by the affiant himself. The events leading up to the delivery of the drugs to the defendant were witnessed by the affiant also. The contents of the package, the address, and the size and shape of the package have all been verified. The hearsay informants' facts have been corroborated by the affiant's personal observation. Furthermore, the affidavit establishes that neither Hisatake nor Baba were ordinary "informants." Both were government officials; Hisatake was a DEA officer and Baba was a federal plant inspector. Defendant argues that because the three officials (Green, Hisatake and Baba) were not closely involved in an ongoing criminal investigation, and because Baba was not a police officer, their status is relatively

16

insignificant. A different view is expressed in W. LaFave, SEARCH AND SEIZURE §3.5(a)(1978) at 619-20:

> "...[A]n 'informer,' in the narrow sense of that word, is by no means presumed to be a credible person. This means that it is generally necessary, as a prerequisite to establishing probable cause on the basis of what the informer has told the police, to establish that he is reliable (e.g., by showing he has proved to be reliable on past occasions) or that his information is reliable (e.g., by showing that he has made an admission against his penal interest in the course of giving the information). By contrast, the average citizen who is thrust into the position of being a victim of or a witness to criminal conduct and who thereafter reports what he saw and heard to the police is generally presumed to be reliable, and thus no special showing of such reliability in the particular case is necessary. As might be expected the same may be said of a person who is a law enforcement officer.

> "The point was clearly made by the Supreme Court in United States v. Ventresca, involving a search made pursuant to a search warrant obtained upon the affidavit of one Mazaka, an investigator for the Alcohol and Tobacco Tax Division of the Internal Revenue Service. The affidavit referred to various occasions upon which sugar and empty tin cans were observed being carried into certain premises, filled cans were carried out, the odor of fermenting mash was smelled from the sidewalk in front of the premises, and the sounds of a motor or pump were heard coming from the direction of the same premises. These various factual allegations were prefaced in the affidavit with a statement that they were based upon observations by the affiant and 'upon information received officially from other Investigators attached to the Alcohol and Tobacco Tax Division assigned to this investigation, and reports orally made to me describing the results of their observations and investigation.' Although a divided Court of Appeals ruled this affidavit insufficient, the Supreme Court disagreed . . ..

> "Following the lead of Ventresca, lower courts have consistently held that another law enforcement officer is a reliable source and that consequently no special showing of reliability need be made as a part of the probable cause determination."
> (emphasis added)

Montana has recognized a distinction between a "mere informer" and a "citizen-informant," i.e., one who is "motivated by good citizenship." The citizen-informant is accepted as reliable. State v. Leistiko (1978), 176 Mont. 434, 578 P.2d 1161. We find no reason to require a showing

of reliability as to either Hisatake or Baba. Hisatake was working for the DEA, although actually a Honolulu police officer; while Baba was somewhere between a citizen-informant and a police officer and also must reasonably be seen as reliable.

In discussing the hearsay aspect, it is important to consider the pertinent part of the application for search warrant:

> "COMES NOW RON GREEN, of the Bozeman Police Department, and being first duly sworn upon oath, deposes and says:
>
> "1. That your affiant of the Bozeman Police Department received a phone call from Harvey Hisatake on April 3, 1981. Harvey Hisatake identified himself as a drug enforcement agency agent stationed in Honolulu, Hawaii;
>
> "2. That Agent Harvey Hisatake informed your affiant that a Federal Agricultural Inspector, while routinely checking packages delivered to United Parcel Service in Honolulu, Hawaii on April 2, 1981, examined a 9" x 9" x 13" package addressed to James Kelly at an address of 1207 Fox Street, Bozeman, Montana and with a return address of Rosemary Kelly, 1214 Punahall Street, #210, Honolulu, Hawaii. The Inspector examined the contents of the package and discovered a green-like substance which appeared to be hashish;
>
> "3. That Agent Hisatake conducted a field test on the substance and discovered that it was hashish, a controlled substance. As a result, Agent Hisatake called your affiant to inform him of his discovery. Then, Agent Hisatake resealed the package, rewrapped it, addressed it to your affiant and placed in on airplane for air express delivery to Bozeman, Gallatin County, Montana;
>
> . . .
>
> "5. That your affiant opened the package on April 6, 1981. He discovered five plastic packets of a pressed green substance. Your affiant conducted a field test and determined that the substance was hashish, a controlled substance;
>
> "6. That your affiant also examined the package and observed that it was addressed to James Kelly, 1207 Fox Street, Bozeman, Montana . . .."

The defendant argues that the double hearsay problem arises from Hisatake informing Sgt. Green that a Federal

Agricultural Inspector (unnamed) examined the package addressed to the defendant "while routinely checking packages delivered to United Parcel Service in Honolulu." While that is hearsay, and can be classed as double hearsay, the test to be applied is whether or not the information is reliable or credible. In assessing the reliability of informer Hisatake in particular, it is important to keep in mind that Sgt. Green had confirmed his reliability by his personal examination of the package, including its address, size, shape and contents. Considering all of such information together, we conclude that a sufficient showing has been made of reliability as to Hisatake and the Federal Agricultural Inspector Baba. The other prong of the Aguilar-Spinelli test requires that there be a showing of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were. That has been adequately established by the affidavit which shows that Sgt. Green opened the package, observed the address and tested the contents, determining the same to be hashish. This is a clear confirmation of the informants' conclusion that the narcotics were in the package, where they were claimed to be. We therefore conclude that the two-pronged test of Aguilar-Spinelli has been met and that the hearsay information contained in the application of Sgt. Green was sufficient to form a justification for a finding of probable cause and issuance of the search warrant.

While we have concluded that the Aguilar-Spinelli test has been met, we refer again to Illinois v. Gates, which is a case decided so recently that the parties had no time to address it in briefs or oral argument. This United States Supreme Court decision abandons the two-pronged test established by Aguilar-Spinelli. The Court takes a great

step away from the "labyrinthine body of judicial refinement" built over the "prongs" and "spurs" of the <u>Aguilar-Spinelli</u> tests. Slip opinion at 25.

In <u>Illinois v. Gates</u>, the United States Supreme Court overturned a suppression order where evidence of marijuana and weapons possession had been obtained pursuant to a warrant, as the result of an anonymous tip, partially verified as to "innocent details" by a police officer. There was no identification of the informant, and no indication of how the informant obtained his or her knowledge. Excerpts from the opinion, explaining the Court's rationale, follow:

> "We agree with the Illinois Supreme Court that an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case, which the opinion of the Supreme Court of Illinois would imply. Rather, as detailed below, they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place.

> "This totality of the circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific 'tests' be satisfied by every informant's tip. Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a 'practical, nontechnical conception.' <u>Brinegar v. United States</u>, 338 U.S. 160, 176 (1949). 'In dealing with probable cause,-.-.-.-as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " Slip opinion at 15-16.

The Court concluded:

> "[I]t is wiser to abandon the 'two-pronged test' established by our decisions in Aguilar and Spinelli. In its place we reaffirm the totality of the circumstances analysis that traditionally has informed probable cause determinations . . .. The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of

knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing] that probable cause existed.'" Slip opinion at 23 (emphasis added).

Applying the Gates test, we hold that under the totality of the circumstances as listed above, the issuing magistrate here had a substantial basis for concluding that probable cause existed, and therefore conclude, on both the Aguilar-Spinelli test and the Gates test, that the affidavit is a sufficient basis for the issuance of the warrant.

Finally, we consider defendant's argument that he was "entrapped" by Bozeman police and that, since entrapment was evident from the face of the affidavit, the issuing magistrate should not have signed the first search warrant. Defendant argues that "[h]ad it not been for the police conspiracy to deliver sealed contraband to its unsuspecting recipient, the police would never have been in his house to make their 'plain view' observation of other illegal items." There are, then, two questions involved:

a. Whether the magistrate improperly approved the first search warrant.

b. Whether defendant's conviction must be overturned because he was entrapped.

In State v. Kamrud (1980), ____ Mont. ____, 611 P.2d 188, 190-91, 37 St.Rep. 933, 936-37, we stated:

"The entrapment defense is not a constitutional one, as the United States Supreme Court recognized in United States v. Russell (1973), 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, where it held that 'the defense is not of a constitutional dimension.' Therefore, we must look primarily to Montana statutes and case law.

"The federal cases are nevertheless relevant to the extent that they apply the same test used in Montana. The Commission Comment to our statute defining entrapment, section 45-2-213, MCA, states

that '[t]he defense of entrapment generally follows the rule stated by the majority in the Sorrells case.' (Sorrells v. United States (1932), 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249.) Entrapment is, of course, an affirmative defense, and the burden of proving it rests on the defendant. LaCario, 518 P.2d 982, 985; State v. White (1969), 153 Mont. 193, 456 P.2d 54, 56; O'Donnell, 354 P.2d 1105, 1106; Parr, 283 P.2d 1086, 1089.

"This Court has held that the defense of entrapment may be established as a matter of law. In State v. Grenfell (1977), 172 Mont. 345, 564 P.2d 171, we overturned the defendant's conviction of sale of dangerous drugs on the grounds that the defense of entrapment had been established as a matter of law. Montana has recognized the entrapment defense by case law, and it is now codified in section 45-2-213, MCA:

'Entrapment. A person is not guilty of an offense if his conduct is incited or induced by a public servant or his agent for the purpose of obtaining evidence for the prosecution of such person. However, this section is inapplicable if a public servant or his agent merely affords to such person the opportunity or facility for committing an offense in furtherance of criminal purpose which such person has originated.'

"This Court has held:

'This statute is consonant with earlier decisions of this Court which set forth the following elements of entrapment: (1) Criminal intent or design originating in the mind of the police officer or informer; (2) absence of criminal intent or design originating in the mind of the accused; and (3) luring or inducing the accused into committing a crime he had no intention of committing. State ex rel. Hamlin, Jr. v. District Court, 163 Mont. 16, 515 P.2d 74; State v. Karathanos, 158 Mont. 461, 493 P.2d 326.' State v. Grenfell, supra, 564 P.2d at 173.

"See also State v. Gallaher (1978), Mont., 580 P.2d 930, 935, 35 St.Rep. 848."

Thus, if the evidence before the magistrate had established as a matter of law that the three elements of entrapment were indisputably present and therefore under section 45-2-213, MCA, the defendant could not be guilty of the crime of possession with intent to sell, the magistrate did err in issuing the search warrant, as defendant asserts. That was not the case, however. The magistrate knew that defendant

22

received and accepted a UPS package of hashish as a result of a controlled delivery. There was no evidence before her of any absence of criminal intent in the mind of the defendant; nor was there any suggestion that defendant had been lured into committing a crime he had no intention of committing. It is true that given these requirements, it would be a rare situation where a magistrate could find entrapment as a matter of law at this stage. Certainly here, defendant has not met his burden of proving that the warrant was erroneously issued on grounds of entrapment.

Entrapment, if proven, mandates reversal of a conviction. It does not mandate the suppression of evidence. Here, where the evidence establishing defendant's predisposition to commit the crime charged was seized pursuant to a valid search warrant, it may be used to prove that predisposition.

The first search warrant was issued upon probable cause. The record does not establish entrapment as a matter of law. The search uncovered very persuasive evidence that defendant was deeply involved in large-scale drug traffic. Because seizure of the evidence followed a legitimate search, that evidence was admissible at trial to overcome defendant's claim that he was entrapped. It was for the fact-finder to decide, on the basis of evidence presented at trial, whether defendant was not guilty because he was entrapped. In Kamrud, ____ Mont. at ____, 611 P.2d at 191, 37 St.Rep. at 937, we stated:

> "'Entrapment occurs only when the criminal intent or design originates in the mind of the police officer or informer and not with the accused, and the accused is lured or induced into committing a crime he had no intention of committing. Only when the criminal design originates, not with the accused, but in the mind of government officers and the accused is by persuasion, deceitful representations, or inducement, lured into the

23

> commission of a criminal act, can a case of entrapment be made out. In short, there is a controlling distinction between inducing a person to do an unlawful act and setting a trap to catch him in the execution of a criminal design of his own conception . . .' State v. Karathanos (1972), 158 Mont. 461, 493 P.2d 326, 331 (holding that there was no entrapment where the defendant approached a police informant in a bar and offered to sell her drugs, later completing the transaction)." (emphasis added)

Defendant's "crime" was not his acceptance of the box of hashish, as he insists; it merely provided probable cause to believe he knowingly possessed dangerous drugs with intent to sell. The evidence of defendant's crime of possession with intent to sell was properly, and convincingly, admitted at trial to defeat his affirmative defense of entrapment and prove that he was indeed "caught in the execution of a criminal design of his own conception."

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

24

_John Conway Harrison_

_L. C. Gulbrandson_

_____

_____

_____

Justices

Mr. Justice Daniel J. Shea dissents and will file a
written dissent later.

Mr. Justice Frank B. Morrison, Jr., will file a separate
opinion later.

Mr. Justice John C. Sheehy, dissenting:

I dissent.

The general rule is that a warrantless search, administrative or otherwise, is illegal. Camara v. Municipal Court (1967), 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930. An exception to the general rule was carved in United States v. Schafer (9th Cir. 1972), 461 F.2d 856. It is necessary to examine the facts of the Schafer case to determine why the circuit court made an exception to the general rule.

Terry Lee Schafer was a departing passenger on an airline out of Hawaii. Her handbag was searched when she presented herself at the airport for departure. In her handbag was found a quantity of LSD pills. The search was made by federal authorities pursuant to federal statutes which prevent the transportation from Hawaii of certain quarantined agricultural substances which might spread disease or other injurious effects in the continental United States. The Secretary of Agriculture had adopted a regulation which expressly provided that "[a]ll baggage and other personal effects of passengers" were to be searched at airports pursuant to the federal law. 7 C.F.R. § 318.13-12(a). In Schafer, therefore, the Ninth Circuit Court of Appeals was impressed by the fact that there was an express provision of federal administration regulation that required the search of all baggage or other personal effects of all departing passengers. The Secretary's power to make such a regulation was founded on 7 U.S.C. § 150(ee) and 162. The Ninth Circuit Court of Appeals upheld this warrantless search because it applied to all persons, was founded on an express regulation, and the exigency of a departing passenger

made the time necessary to procure a search warrant impractical and would render nugatory the desired goal of preventing quarantined articles from reaching the continental United States.

Contrast the situation in Schafer with that which occurred here. We have a package resting in the United Parcel Service receiving room in a town in Hawaii. The agent in this case does not search all packages. The field officer is given discretion as to which of the packages he will search. In this case he conducted admittedly a "random" search. The field official testified that no searches were ever conducted on packages received at UPS in the afternoon. In fact, he came to the UPS office during the lunch hour, when the conveyor belt in the UPS office was stopped, and inspected some twelve packages of the unspecified number on the belt. He based his inspections solely on the weight of the packages, after eliminating any packages going between business or mail order addresses. Why he made that distinction he did not specify in his testimony. No reason was shown in his testimony why he had to seize the package here without a search warrant. His inspection of the package in question revealed no plants bearing diseases or other substances which might injuriously affect crops in the continental United States.

The evidence reveals no exigency existing which would prevent him from procuring a search warrant. The same line of reasoning applies to officer Hisatake, to whom Baba, the federal official, turned over the opened package. Certainly no exigency existed as to Hisatake, who should have procured a search warrant before seizing the property reported to him by Baba.

- 27 -

What the majority has done in this case is to bootstrap the narrow Schafer exception to Camara into a now general rule that any intrusion by a federal official or a state official into packages in commerce without a warrant is permissible, provided that some federal statute allows the federal agent a right of inspection. The majority has carried Schafer too far.

The search by Baba was illegal, because no probable cause existed for him to suspect that the package in question contained quarantined substances; it was illegal as to Hisatake, because there was no exigency existing which would prevent him from procuring a search warrant to seize the property discovered by Baba.

A strong factor on which the Ninth Circuit Court upheld the search in Schafer was that the decision to inspect was not subject to the discretion of the official in the field, relying on Camara, 387 U.S. at 532, 87 S.Ct. at 1733, 18 L.Ed.2d at 937.

Since the seizure was illegal in its inception, all other evidence uncovered by the prosecution after the illegal seizure should have been suppressed by the District Court.

Then there is the question of entrapment in this case. Our statute defining the crime of possession of dangerous drugs with intent to sell has an inherent peculiarity. Section 45-9-103, MCA. The permissible sentences under the crime are heavier than for mere possession of dangerous drugs. Section 45-9-102, MCA. The code compiler lists these elements as necessary to a conviction for criminal possession of dangerous drugs with intent to sell: (1) knowing (2) control of a (3) dangerous drug for a sufficient time to be able to terminate control, as well as (4) intent to sell the

drug. Since the package here was seized in the Kelly home unopened, in the same condition as delivered, there is no evidence in this case upon which Kelly's conviction can be founded, since none of the elements of the crime could be proved beyond a reasonable doubt.

It is idle to recite as the majority recites, that it is for the fact finder to determine entrapment in this case. There were no facts for the fact finder to find. Kelly had done nothing but receive from the officers here a package they had delivered to him containing drugs. It is on the receipt alone that the conviction here is founded. His knowing control of a dangerous substance, and his intent to sell the same are completely absent from the evidence.

My conclusion is that the power of federal agricultural agents to inspect packages in Hawaii for quarantined plants and insects is being used by law enforcement as an instrument to get into homes otherwise out of their purview. We have developed some strange philosophies about drugs and privacy. The law permits a man to watch lewd movies in his home to his heart's content. I find that detestable. The law does not permit a man to use drugs in the privacy of his own home. I find drug use also detestable, but I am unable to distinguish the legal concepts that differentiate the privacy rights of the drug user from the lewd-movie watcher. But even where the law is being violated, there are privacy rights in a home which the courts ought to protect as sacred. The federal officer here, Baba, found no violation of the law he was empowered to enforce. Hisatake, the Hawaiian Five-O, without a warrant, took the package out of the stream of commerce to readdress the package. Hisatake reinserted the package into commerce in a scheme designed to get the Bozeman officers

into the Kelly home. Every step of those actions was unlawful. I won't condone it.

The officers in this case testified they had no claim that Kelly mailed or had caused to be mailed the package to himself. His conviction rests simply on the package delivered to him by the officers, addressed to him by them, and originally sent into commerce by an unknown and unidentified person. Kelly's possession is at most constructive only.

Do you have an enemy you would like to frame? Buy yourself an airline ticket to Hawaii and while there round up some marijuana, place it in a heavy package addressed to your enemy but not otherwise conspicuous and deliver it to UPS, but be sure to deliver it in the morning. Chances are it will be randomly opened by someone named Baba who in turn will turn it over to the authorities to make certain that it is delivered to your enemy. Our law enforcement officers will see to it that he is tailed, nailed and jailed. His mere possession of the package will be enough, with the blessing of this Court.

In speaking of entrapment, I refer only to the drugs contained in the package. The other drugs and paraphernalia seized in the home may have independently sustained a conviction in a proper case, but here they are tainted by the illegal entry of the officers into the Kelly home.

_____
John G. Shirley
Justice