No. 02-627

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 300

STATE OF MONTANA,

      Plaintiff and Respondent,

   v.

CONNIE BEAUPRE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
                In and For the County of Jefferson, Cause No. DC 2002-1812,
                Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Edmund F. Sheehy, Jr., Cannon & Sheehy, Helena, Montana

      For Respondent:

          Honorable Mike McGrath, Attorney General; Jim Wheelis, Assistant
          Attorney General, Helena, Montana

          Valerie Wilson, County Attorney, Boulder, Montana

                       Submitted on Briefs: October 19, 2004

                            Decided:   October 26, 2004

Filed:

_____
                Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Connie Beaupre (Beaupre) pled guilty to criminal possession of dangerous drugs and criminal possession of drug paraphernalia in the Fifth Judicial District, Jefferson County, reserving her right to appeal the District Court's denial of her motion to suppress evidence, which she now challenges on appeal. We affirm.

¶2 We restate the issues on appeal as follows:

¶3 1. Did the substitute justice of the peace have authority to issue the search warrant?

¶4 2. Was the warrant supported by probable cause?

¶5 3. Did the District Court err in finding a valid consensual search?

¶6 4. If the search warrant was invalid, does the fruit of the poisonous tree doctrine require suppression of the evidence seized through the consensual search?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶7 In February 2002 Broadwater County Deputy Sheriff Pat Hamilton received a computer disk from an informant. The disk contained photographic images of suspected drugs, paraphernalia, and cooking components for methamphetamine taken at the residence of Beaupre and her husband, Shane Beaupre (Shane), on Lower Valley Road, in Boulder, Montana. The informant told Hamilton the pictures had been taken while informant was working on a crew hired to clean the Beaupres' residence after a fire. The informant also told Hamilton that there were several empty cans of Coleman fuel, a potential precursor to methamphetamine, outside the Beaupre residence. Hamilton subsequently contacted Jefferson County Deputy Sheriff Bob Gleich and told Gleich about the informant's report,

2

including the photographs. Gleich did not speak with the informant because the informant had told Hamilton that she wished to be kept out of the proceedings.

¶8 Based on the images on the disk and the conversation with Hamilton about the informant's report, Gleich applied for a search warrant on or about February 6, 2002, to search the Beaupres' Lower Valley Road residence and a storage unit also owned by the Beaupres on 412 North Monroe in Boulder. Gleich testified that Justice of the Peace Dennis Giulio was unavailable and, further, that District Judge Loren Tucker was unavailable, so acting Justice of the Peace Debbie Rennie approved the warrant.

¶9 Gleich received the warrant about 4:00 p.m. and, with the assistance of agent Daniel J. Doyle of the Southwest Montana Drug Task Force, Montana Highway Patrol Officer Jay Hanson and other officers, served it at approximately 6:30 p.m. at the Beaupres' Lower Valley Road residence. The officers found a marijuana pipe, a couple of brass finger scales, snort straws, glass jars with residue, a roach clip, and a small round mirror, but did not locate any of the items depicted in the photographic images provided by the informant. Gleich contacted Hamilton and asked him to inquire of the informant where those items might be located. Hamilton did so, and the informant stated that the items were possibly at the Beaupres' rented residence on Second Avenue in Boulder. Hamilton relayed this information to Gleich. While one search team of officers went to the storage unit, Gleich, Doyle, Hanson, and Officer Nelson of the Jefferson County Sheriff's Office went to the Beaupres' rented home on Second Avenue. From this point, the Beaupres' and the officers' stories differ.

3

¶10 Gleich testified that only he and Doyle approached the house and knocked on the door. He said that when Beaupre answered the door, they asked if they could enter and she gave them permission. Once they were inside Beaupre woke up Shane, who was sleeping on the couch. Doyle explained to the Beaupres that they were there because they had a search warrant for the Beaupres' storage unit and the Lower Valley residence based on information that the Beaupres were producing methamphetamine at that residence. The officers then asked for a key to the storage unit's lock to avoid having to cut off the lock. Shane went out to his truck, followed by Gleich, to retrieve the key. Once Shane located the key, he turned it over to Gleich who radioed an officer from the storage unit search team to come and pick up the key.

¶11 Gleich further testified that Doyle asked the Beaupres if they had any of the items the officers were looking for. The Beaupres denied having any of the items and told Gleich and Doyle to search the residence if they wanted. Gleich then went back outside to his patrol car and retrieved a consent to search form. Because the pre-printed form was for a vehicle, Gleich wrote in "residence" in the space for car make and model. While walking back to the house, Gleich testified that he told Nelson, who was standing on the porch by this time, that they had been given permission to search and Gleich wanted Nelson to assist. Once he was back in the home, Gleich then read the document, line-by-line, to the Beaupres, gave the document to Shane, and Shane read and signed it.

¶12 Beaupre testified that the officers, once she let them inside, told her that they were there in anticipation of finding a meth lab, that they had already been to the Beaupres' other

4

residence and had found nothing, "and figured [the Beaupres] had moved it uptown . . . . They presented a search warrant and said if we [didn't] sign it [the officers] were going to tear the place apart." She testified that the warrant was not read out loud to either Shane or her. She also indicated that when the consent to search form was presented to her and Shane, the officers asked for a key to the storage unit and another officer entered the home with a large set of bolt cutters.

¶13 Shane testified that there were at least five or six officers in the house; that Gleich did not read the consent to search form to Shane; that Shane was told the consent form was for a vehicle; and that Shane had felt pressured and read only half of the consent form before he signed it. In addition, Shane testified that he was not prepared to face the officers' requests because he had been in a deep sleep on the couch after working a fourteen-hour shift. Shane did testify, however, that the search of the Second Avenue house did not commence until after he signed the consent form.

¶14 Doyle's testimony was substantially similar to Gleich's. He added that bolt cutters were never mentioned or brought into the home, that he had asked the Beaupres if it would be all right if other officers entered to help with the search, and that the Beaupres had consented. Doyle further testified that once Shane signed the consent form, Doyle searched the Beaupres' bedroom and there located Beaupre's purse. Inside the purse there were syringes and a half a gram of methamphetamine in an eyeglass repair kit. Additional syringes and a set of scales were also found in the bedroom.

¶15 On March 27, 2002, Beaupre was arraigned in the District Court on an amended information charging her with criminal possession of dangerous drugs, a felony, and criminal possession of drug paraphernalia, a misdemeanor. She filed a motion to suppress evidence, claiming the search warrant was void *ab initio* because acting Justice of the Peace Rennie was without lawful authority, the evidence seized was fruit of the poisonous tree, and there was no valid consent to the search of the Second Avenue residence. On July 17, 2002, the court ruled that there was probable cause to issue the search warrant and that the Beaupres had consented to the search of their rented home. Later that month, the District Court issued a supplemental order concluding that substitute Justice of the Peace Rennie, contrary to Beaupre's claim, was qualified by law to act and the search warrant she had issued was issued with valid authority.

¶16 In August, at a change of plea hearing, Beaupre pled guilty to criminal possession of dangerous drugs and criminal possession of drug paraphernalia, reserving her right to appeal the suppression issues. The District Court imposed a three-year deferred sentence for criminal possession of dangerous drugs and a concurrent six-month deferred sentence for possession of drug paraphernalia, during which Beaupre would be under the supervision of the Department of Corrections and would adhere to several conditions. Beaupre subsequently filed a notice of appeal with this Court and then moved the District Court to stay the fine and surcharges, which the District Court granted.

**STANDARD OF REVIEW**

¶17 Citing to our decision in *State v. Rushton* (1994), 264 Mont. 248, 870 P.2d 1355, Beaupre states that the standard of review for a motion to suppress is whether there is substantial credible evidence to support the court's findings of fact and whether those findings were correctly applied as a matter of law. However, in *State v. Hermes* (1995), 273 Mont. 446, 904 P.2d 587, we modified the substantial credible evidence standard used in *Rushton* and stated that we would not "overturn a District Court's findings of fact regarding suppression hearing evidence unless those findings are clearly erroneous." *Hermes*, 273 Mont. at 449, 904 P.2d at 589 (quoting *State v. Cope* (1991), 250 Mont. 387, 396, 819 P.2d 1280, 1286). We have further held that findings of fact are clearly erroneous "if they are not supported by substantial evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed." *State v. Lacasella*, 2002 MT 326, ¶ 10, 313 Mont. 185, ¶ 10, 60 P.3d 975, ¶ 10.

**DISCUSSION**

**ISSUE ONE**

¶18 *Did the substitute justice of the peace have authority to issue the search warrant?*

¶19 Beaupre argues that § 3-10-231(3), MCA, was violated because there was no attempt to call in another justice of the peace or city judge to issue the search warrant prior to contacting substitute Judge Rennie for execution of the warrant and that the warrant is void pursuant to our decisions in *State v. Vickers*, 1998 MT 201, 290 Mont. 356, 964 P.2d 756, and *Potter v. Dist. Ct. of 16th Jud. Dist.* (1994), 266 Mont. 384, 880 P.2d 1319.

7

¶20     Section 3-10-231, MCA, provides:

(1) Whenever a justice of the peace is disqualified from acting in any action because of the application of the supreme court's rules on disqualification and substitution of judges, 3-1-803 and 3-1-805, the justice of the peace shall either transfer the action to another justice's court in the same county or call a justice from a neighboring county to preside.

(2) (a) The following requirements must be met to qualify a substitute for a justice of the peace:

(i) Within 30 days of taking office, a justice of the peace shall provide a list of persons who are qualified to hold court in the justice's place during a temporary absence when another justice or city judge is not available. The persons listed must be of good moral character and have community support, a sense of community standards, and a basic knowledge of court procedure.

(ii) The sitting justice of the peace shall request and obtain from the commission on courts of limited jurisdiction established by the supreme court a waiver of training for the substitutes.

(iii) Each person on the list, provided for in subsection (2)(a)(i), shall subscribe to the written oath of office as soon as possible after the person has received a waiver of training from the supreme court. The oath may be subscribed before any member of the board of county commissioners or before any other officer authorized to administer oaths.

(b) The list of qualified substitutes, the written oath, and the commission's written approval and waiver of training for those substitutes, pursuant to subsection (2)(a)(ii), must be filed with the county clerk as provided in 3-10-202.

(c) A county clerk may provide a current list of qualified and sworn substitutes to local law enforcement officers.

(3) Whenever a justice is sick, disabled, or absent, the justice may call in another justice, if there is one readily available, or a city judge or a person from the list provided for in subsection (2) to hold court for the absent justice until the absent justice's return. If the justice is unable to call in a substitute, the county commissioners shall call in another justice, a city judge, or a person from the list provided for in subsection (2).

(4) During the time when a justice of the peace is on vacation or attending a training session, another justice of the peace of the same county is authorized to handle matters that otherwise would be handled by the absent justice. When there is no other justice of the peace in the county, the justice of the peace may designate another person in the same manner as if the justice were sick or absent.

(5) A justice of the peace of any county may hold the court of any other justice of the peace at that justice's request.

8

¶21    In *Potter*, we held that, pursuant to § 3-10-231(2), (3), and (4), MCA, "a sitting justice of the peace must first attempt to call in another justice of the peace, if there is one readily available, or a city judge before resorting to calling in a qualified substitute judge from the list." *Potter*, 266 Mont. at 391, 880 P.2d at 1324 (citation omitted). In *Vickers*, we held that the statute did not permit a justice of the peace to delegate to law enforcement the task of contacting another justice, but rather, the justice was required to personally contact a replacement. *Vickers*, ¶ 28.

¶22    The record indicates that, prior to this incident, Judge Guilio obtained letters from judges in Helena and Butte indicating that they were not available should he be absent. These letters were updated every six months. Judge Guilio followed this course of action pursuant to advice provided in an Attorney General's opinion, which stated, in part, as follows:

> A letter from a neighboring justice stating that he or she is too busy to act as a substitute may be relied upon by the sitting justice for a reasonable period of time. It would be unreasonable, however, to rely upon such a letter indefinitely to determine the availability of the justice. Periodically, the justices who wrote the letters should be contacted to determine if they are still unavailable. The reasonableness of such a time period may vary, but it would be prudent to contact the justices every four to six months to determine whether they are still unavailable.

48 Op. Att'y Gen. No. 11 (2000).

¶23    Additionally, the State offered a letter at the suppression hearing from Judge Guilio which stated that he had also personally visited with the judges "in all counties" regarding their availability. This evidence is not challenged on appeal.

9

¶24    Thus, consistent with *Vickers*, Judge Guilio personally contacted the other judges, and did not simply instruct police to do so. Consistent with *Potter,* Judge Rennie, Judge Guilio's designated substitute, was called into service after Judge Guilio had previously determined that the other judges were not available.[1]

¶25    Beaupre further argues that, although the letters obtained by Judge Guilio may have verified that judges were unavailable in Butte and Helena, there was no such letter obtained from a justice of the peace in Townsend, Broadwater County, and therefore, not all of the "neighboring counties" were contacted prior to bringing Judge Rennie into service. This argument is in reference to the requirement in § 3-10-231(1), MCA, that the justice of the peace shall "call a justice from a neighboring county to preside."

¶26    We note, however, that § 3-10-231(1), MCA, governs substitution when a justice of the peace is disqualified from acting pursuant to the judicial disqualification statutes. The "neighboring county" provision is not repeated in other subsections of the statute governing substitutions for sickness, disability, vacation, attending a training session or other absences. Section 3-10-231(3) and (4), MCA. However, we need not resolve this question of statutory interpretation for purposes of this case because Judge Guilio, in addition to obtaining letters from some counties, received verbal confirmation from the judges "in all counties" of their unavailability, which would mean, at a minimum, those counties neighboring Jefferson County.

---

[1]The 1997 amendments to § 3-10-231, MCA, which followed *Potter* and *Vickers*, do not affect the analysis here.

¶27 Beaupre also criticizes Gleich for making no attempt to contact a judge from Butte, Helena or Townsend prior to contacting Judge Rennie. However, it was precisely such "judge-shopping" by law enforcement which we held was inappropriate in *Vickers*. *Vickers*, ¶ 28 ("Judge Larsen simply provided law enforcement with a 'menu' of substitutes from which to choose. This procedure clearly violates § 3-10-231, MCA, and encourages 'judge-shopping.'"). Under the statute, it is the duty of the sitting judge to determine what other judges are available, and here, Judge Guilio did so.

¶28 Having considered Judge Guilio's efforts, we cannot conclude that § 3-10-231, MCA, and the interpretations thereof rendered in *Potter* and *Vickers*, were violated.

¶29 Beaupre next claims that Judge Rennie's designation as substitute judge did not comply with § 3-10-231(2)(a)(i), MCA, which requires a substitute to be designated by a justice of the peace "[w]ithin 30 days of taking office," because Judge Guilio's designation of Judge Rennie occurred in late November 1998, following his re-election, and because Judge Rennie's oath of office was sworn to before District Judge Frank Davis on December 31, 1998, the last day of Judge Guilio's first elected term and prior to the initiation of his second elected term.

¶30 However, according to Merriam-Webster's Collegiate Dictionary (1998), the preposition "within" is "used as a function word to indicate situation or circumstance in the limits or compass of: as . . . before the end of[.]" Such a reading of "within," used as a preposition by § 3-10-231(2)(a)(i), MCA, would require designation of a substitute "before the end of" thirty days following the judge's taking office. The statute does not, by its plain

11

language, preclude designation of a substitute prior to the initiation of the term for which the judge was elected. As the District Court reasoned:

> [T]he legislature intended to create a deadline for the various activities which establish eligibility for substitutes rather than creating a narrow window of time within which qualifying action must be taken. Qualifications for substitute Justice of the Peace in this case were complete long before the deadline.

¶31 The language here thus has the effect of setting a deadline for designation of a substitute at thirty days following the beginning of the term. Judge Guilio was elected for a second term in November 1998 and, as the incumbent judge, thereafter completed the process for designating a substitute in November and December 1998. His designation thus satisfies the timing requirement because it was completed prior to the expiration of the statutory deadline.

¶32 The dissent offers an alternative interpretation of this provision, but enters the theoretical world to do so, positing that the issue must be addressed "as though Judge Guilio had been newly elected in November of 1998," and that, therefore, the question is whether Judge Guilio could have taken "any official action prior to taking office." However, that is not the reality here, and therefore, does not solve the dilemma. Judge Guilio was *not* newly elected in November of 1998 and the issue is *not* whether he could have taken action prior to taking office. In fact, he was an incumbent judge who took the action while he was in office. Our duty is to apply this statute to this case, not to theoretical circumstances that may provide easier choices. In short, we must face the facts.

12

¶33    Neither do the other "30 day provisions" offered by the dissent provide any assistance. Quite simply, under *none* of those provisions would it be possible for the contemplated action to be completed prior to the commencement of the thirty-day period.  How could a district court set aside an agency decision before it was rendered?  Indeed, there would be nothing to set aside. The meanings of these provisions are obvious from their individual contexts, and are not governed by a universal application of the definition of "of, " as the dissent suggests.  Here, the statute in question does not prohibit action by a sitting judge and is reasonably interpreted to set a deadline by which the action had to be completed.  The District Court was correct in so holding.

¶34    Lastly, Beaupre argues that Judge Rennie's designation as a substitute judge was unlawful because Judge Rennie's "waiver of training" form signed by Judge Guilio on December 10, 1998, designated Judge Rennie as a substitute "until the end of my present term of office," which drew to a close shortly thereafter with the expiration of the year 1998. However, we have already determined that Judge Rennie was timely designated under the statute as a substitute judge for Judge Guilio's second term, beginning in January 1999. Further, the record reflects that the documentation to accomplish that purpose, including Judge Rennie's waiver of training form, was properly submitted by Judge Guilio.  Thus, despite the inaccurate wording on the training form itself, Judge Guilio satisfied all of the statutory requirements for designation of Judge Rennie as a substitute judge, and therefore, we conclude that the error in the wording is of no consequence, and did not affect Judge

Rennie's authority to act. Accordingly, we hold that Judge Rennie had authority to issue the search warrant.

## ISSUE TWO

¶35   *Was the warrant supported by probable cause*?

¶36   Beaupre claims that there was insufficient information to establish probable cause necessary for issuance of the search warrant because the informant was anonymous as to Officer Gleich and her report was not corroborated by police. She also notes that the photographs taken by the informant did not exhibit all of the items identified in the application. The State responds that there was probable cause because the informant was not anonymous as to Officer Hamilton, and, even if the information was hearsay to Gleich, it was nonetheless reliable because it was founded upon the personal observations of the informant, acting as a concerned citizen, and upon pictures which confirmed the informant's information.

¶37   We must determine whether the District Court, in issuing the search warrant, "had a substantial basis to determine probable cause existed." *State v. St. Marks*, 2002 MT 285, ¶ 12, 312 Mont. 468, ¶ 12, 59 P.3d 1113, ¶ 12. In analyzing whether probable cause existed, we do not look at "each individual fact presented in the application for search warrant," but rather a "totality of the circumstances." *St. Marks*, ¶ 22. Where a warrant is based on an informant's information, we have previously "set out a step-by-step analysis for determining when further corroboration of an informant's information is necessary to establish sufficient

14

probable cause." *St. Marks*, ¶ 24; *see State v. Reesman*, 2000 MT 243, ¶¶ 28-35, 301 Mont. 408, ¶¶ 28-35, 10 P.3d 83, ¶¶ 28-35.

¶38    First, if the informant is anonymous, independent corroboration of the informant's information is required. *Reesman*, ¶ 28. If the informant is not anonymous, the next inquiry is whether the informant's information is based on personal observation or hearsay. *Reesman*, ¶ 29.    If based on hearsay, then independent corroboration is needed. *Reesman*, ¶ 30. If based on the informant's personal observation, we then address reliability by determining whether the informant has provided reliable and accurate information to officers in the past, whether the admission is against the informant's interest, or whether the informant was motivated by good citizenship. *Reesman*, ¶¶ 31-34.

¶39    Addressing the first requirement, Beaupre argues that the informant was anonymous because Gleich was not aware of the informant's identity, and distinguishes our holding in *State v. Oleson*, 1998 MT 130, 289 Mont. 139, 959 P.2d 503 (*overruled in part on other grounds by State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19), which was relied upon by the District Court. In *Oleson*, an informant advised a game warden that the informant had observed an individual in a pick-up truck with the license "RIG PIG" spotlighting near the Yellowstone River, and had heard gunshots coming from the pick-up's location. *Oleson*, ¶ 10. The informant asked to remain anonymous. *Oleson*, ¶ 10. The game warden visited the area identified by the informant and recovered .22-250 caliber shell casings and deer hair in a drainage ditch within ten feet of the shell casings. The warden obtained a warrant and searched the defendant's home for evidence of the unlawful taking

15

of big game, but also discovered twenty-five packets of methamphetamine, money, and records of drug transactions, leading to drug charges. *Oleson*, ¶ 2. Based on the foregoing and the warden's experience and training in wildlife crime detection, we concluded that the District Court did not err in concluding that the warrant to search the defendant's home was supported by probable cause, despite the informant's anonymity. *Oleson*, ¶¶ 11, 19. Beaupre argues that our decision in *Oleson* "relied heavily" on the warden's personal discussion with the informant, but here, Gleich had no discussions with the informant.

¶40 Beaupre's argument here is essentially two-fold. First, she asserts that because Gleich did not personally speak with or know the informant, then, pursuant to *Reesman*, the informant was "anonymous" and police corroboration was required. Secondly, although she does not expressly raise a hearsay issue, she argues that, unlike *Oleson*, the officer (Hamilton) who had personal contact with the informant was not the same officer (Gleich) who applied for the warrant. Her argument implies that because the informant was anonymous as to Gleich, the warrant was defective because it was based upon hearsay. We turn to her first argument.

¶41 Two years after *Oleson*, we more precisely defined, in *Reesman*, both the terms and procedures to be employed in analyzing search warrants based upon an informant's reports. We said an "anonymous" informant "means that law enforcement officers have no idea who is providing the information. A phoned-in Crimestoppers 'tip' is one frequent, common example." *Reesman*, ¶ 28. Clearly, the informant here was not "anonymous" under this definition. Beaupre correctly notes that the informant was not known to Gleich, but the

16

informant was known to Hamilton, who personally talked to the informant and obtained the disk containing pictures from the informant. Hamilton's actions were similar to those of the warden in *Oleson.* Here, like *Oleson*, an officer established the informant's identity and had personal contact with the informant. Hamilton then contacted Gleich, who applied for the search warrant based on the information received from Hamilton and Gleich's own observation of the informant's pictures. Thus, the informant was not "anonymous" as defined in *Reesman*.

¶42 However, though not anonymous, the informant did not want to be identified, and thus, must be considered a "confidential" informant. To determine the need for independent corroboration, we then inquire whether the confidential informant's report was based upon personal observation of the criminal activity. *Reesman*, ¶ 29. This requirement is clearly satisfied by the informant's personal involvement here, which included taking pictures. Lastly, the inquiry is whether the confidential informant may be deemed to be reliable. *Reesman*, ¶ 31.

¶43 The basis offered for establishing reliability here is that the informant was acting as a concerned citizen. When determining whether an informant was acting pursuant to good citizenship, we look to "the very nature of the circumstances under which the incriminating information became known." *Reesman*, ¶ 34 (quoting *State v. Valley* (1992), 252 Mont. 489, 493, 830 P.2d 1255, 1258). The factual situation here is similar to *Reesman*, but is different in a significant respect which requires a different outcome than in *Reesman*.

17

¶44    As here, the informant in *Reesman* was known to police, but remained confidential. *Reesman*, ¶ 37. Further, the warrant application in *Reesman* failed to state that the informant was acting as a "concerned citizen." *Reesman*, ¶ 38. Such an indication is also missing from Gleich's application here. Although describing the informant's personal involvement with the evidence and stating that the informant "then immediately notified law enforcement," the application does not specifically claim that the informant was acting as a concerned citizen.

¶45    However, we reasoned in *Reesman* that it was "more important" for the application to state:

> under what circumstances the informant went to and entered the trailer that day and subsequently was shown the incriminating information she later shared with Detective Hanson. Was she there to clean the carpet? Collect rent? Purchase a gram or two of the fresh harvest? Was she acting under law enforcement direction? Why did [the occupant] so willingly show her his illegal operation? We do not know, and, accordingly, neither did the reviewing magistrate.

*Reesman*, ¶ 38. Because these questions about the informant's involvement and motivation were unanswered by the application, we concluded it was insufficient to provide probable cause without further corroboration. *Reesman*, ¶ 39. However, the application here is not similarly flawed.

¶46    Gleich's application stated that the Beaupres' home had sustained fire damage for which they had contacted a cleaning company. In response, the cleaning crew, including the informant, went to the residence and began working inside. The crew began handling and boxing up personal property items within the house. During that process, the crew observed items they believed to be contraband and an illegal narcotics operation, prompting them to

18

take photographs of the items. Following completion of the cleaning duties, law enforcement was immediately notified. The informant met with police and delivered the photographs.

¶47    Thus, unlike *Reesman*, the application here contained the necessary information to establish the reason for informant's personal exposure to the evidence. The questions unanswered in *Reesman* are answered here. In this case, the informant was acting as an ordinary citizen who worked as part of a hired cleaning crew that cleaned the Beaupres' home after a fire in the residence. The informant was thrust, via employment, into the position of observing drug manufacturing components at the Beaupres' residence and subsequently reported it to the police. There is nothing in the record to suggest any motivation other than good citizenship, and we conclude that the informant was reliable for purposes of establishing probable cause without further corroboration, and that the information used in the application was reliable and credible.

¶48    Beaupre's second argument, that the warrant was impermissibly based on hearsay, is likewise unavailing. We have held that "[i]t cannot be disputed that hearsay information may be considered to establish probable cause," *State v. Kelly* (1983), 205 Mont. 417, 434, 668 P.2d 1032, 1042 (quoting *State ex rel. Townsend v. District Court* (1975), 168 Mont. 357, 360, 543 P.2d 193, 195), but, more specifically, we have also held that "[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *State v. Seaman* (1989), 236 Mont. 466, 472, 771 P.2d 950, 954 (quoting *United States v. Ventresca* (1965), 380 U.S. 102, 111,

85 S.Ct. 741, 747, 13 L.Ed.2d 684, 690). As such, it was not inappropriate for Gleich to rely on the information Hamilton provided.

¶49 Neither was the application insufficient, as Beaupre argues, because the photographs supplied by the informant did not exhibit all of the items listed on the application to be seized during the search. The application relied upon the cleaning crew's personal observations, as communicated by the informant, which was confirmed by photographs of a syringe, cooking components and a white, powdery substance which the crew believed to be cocaine. Officer Gleich, based upon his experience and training, saw other items in the photographs, such as straws, wires and spoons, which he believed were consistent with a drug operation. The informant also related additional information, such as the presence of cooking glassware and empty cans of Coleman fuel. Taken together, the application presented sufficient reliable information to support the search warrant.

¶50 Accordingly, we hold that the District Court did not err in concluding that there was probable cause to issue the search warrant.

## ISSUE THREE

¶51 *Did the District Court err in finding a valid consensual search?*

¶52 Beaupre argues that the District Court erred in finding that there was consent to the search because the District Court did not apply the totality of the circumstances test and instead found that the Beaupres were not credible. The State counters that the District Court did look at the totality of the circumstances and properly concluded that the Beaupres had consented to the search.

¶53 "The knowing and voluntary consent by a citizen to a search is a recognized exception to the warrant requirement." *State v. Olson*, 2002 MT 211, ¶ 19, 311 Mont. 270, ¶ 19, 55 P.3d 935, ¶ 19. In determining whether consent was knowing and voluntary, "we must consider the totality of the circumstances surrounding the giving of the consent." *Olson*, ¶ 21. Beaupre insists that there was no valid consent because she and Shane were coerced into consenting to the search. She alleges coercion because there were numerous officers in her home, Shane did not read the consent form before he signed it, and Shane was taken off guard because he had been sleeping after a long work shift and was not prepared to "face something like this."

¶54 The record clearly indicates that the District Court did consider the totality of the circumstances. In finding that the Beaupres had consented to the search, the District Court noted the "inconsistencies in [the Beaupres'] recollections and in the testimony or the evidence which they provided by their previous affidavits," and orally ruled, in part, as follows:

> there were a minimum number of officers who, first of all, requested permission to enter the house, made an inquiry after they arrived within the house whether they could search, they were authorized verbally to search, they went to the efforts of attempting to corroborate that by a written signature, that was done after Mr. Beaupre read various, depending on his testimony, the top half, which contains all of the terms about voluntarily authorizing the officers to search and remove items or all of the consent form and then a relaxed Mr. Shane Beaupre signed the consent agreement.

¶55 Our review of the record and the District Court's decision indicates that there was substantial evidence to support the District Court's decision. Accordingly, we hold that it did not err in finding that the Beaupres voluntarily and knowingly consented to the search.

21

**ISSUE FOUR**

¶56    *If the search warrant was invalid, does the fruit of the poisonous tree doctrine require suppression of the evidence seized through the consensual search?*

¶57    Because we conclude that the District Court properly found that substitute Justice of the Peace Rennie had authority to issue the search warrant, that the search warrant was supported by probable cause, and that the Beaupres voluntarily and knowingly consented to the search, we do not need to address this issue.

¶58    Affirmed.

/S/ JIM RICE

We concur:
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JIM REGNIER
/S/ JOHN WARNER

Chief Justice Karla M. Gray, dissenting.

¶59    I dissent from the Court's determination that Rennie, the purported substitute justice of the peace, had authority to issue the search warrant. On that basis, I would not reach whether the warrant was supported by probable cause and would conclude that the consensual search--as well as evidence found at the places searched--resulted from an invalid warrant and, therefore, were fruit of the poisonous tree. I would reverse the District Court's denial of Beaupre's motion to suppress.

¶60 The key to the proper resolution of all these issues, as the Court recognizes, is whether substitute justice of the peace Rennie was authorized to issue the warrant. In other words, were the requirements set forth in § 3-10-231, MCA, met? I submit that they were not.

¶61 I agree that the "within 30 days of taking office" phrase in § 3-10-231(2)(a)(i), MCA, is the focal point of this issue because, unless Judge Guilio's designation of Rennie occurred timely within the meaning of that phrase, Rennie was not authorized to issue the search warrant. I disagree with the Court's approach to interpreting that phrase, as well as with the result it reaches therefrom.

¶62 I do not disagree with the Court that a dictionary contains the definition of "within" on which it relies. Indeed, various oft-used and respected dictionaries contain a plethora of definitions of the word "within" when used as a preposition. *See*, *e.g*., THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1976 (4th ed. 2000); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2627 (1971).

¶63 In my opinion, however, the question before us is really not the definition of "within." The question is the meaning of the entire prepositional phrase "within 30 days of taking office." In other words, does the phrase mean, as the Court seems to posit, that Judge Guilio was required to designate Rennie at any time after his re-election in early November of 1998 but no later than 30 days after he took office again? I think not. It is my view that the 30 days run forward from the circumstance included at the end of the prepositional phrase--here, within 30 days *after* taking office. I realize that the Legislature used the word "of" rather

24

than the word "after." But, in my view, the only reasonable interpretation of legislative intent in the context of § 3-10-231, MCA, is "within 30 days after taking office."

¶64 Section 3-10-231(2)(a), MCA, contains only one provision regarding a justice of the peace providing a list of substitute justices of the peace. The requirement is that a justice of the peace shall provide a list of persons qualified to hold court in the justice's place "[w]ithin 30 days of taking office." Section 3-10-231(2)(a)(i), MCA. The statute does not contain a method applicable to a newly elected justice of the peace and a separate method applicable to a re-elected justice of the peace such as Judge Guilio. Thus, this issue must be addressed as though Judge Guilio had been newly elected in November of 1998.

¶65 The question, then, is whether a justice of the peace can take any official action *prior* to taking office, as the Court's analysis of the phrase "within 30 days of taking office" would permit. The answer, quite simply, is "no"--because the elected person does not *become* a justice of the peace for purposes of designating substitutes, or any other purpose, unless and until she or he "takes office." In the present case, it is not disputed that Judge Guilio's designation of Rennie was not timely during his first term of office. By the same token, since the designation was made *prior to*--and not within 30 days *after*--Judge Guilio took office for his second term, the designation did not satisfy the statutory requirements. As a result, Rennie was not authorized to issue the search warrant at issue in the present case.

¶66 Other than a dictionary definition which relates solely to the word "within," the Court advances no authority for its interpretation of the statutory phrase "within 30 days of taking office." This is somewhat surprising, given the number of times the phrase "within 30 days of [some occurrence or event]" appears in Montana law.

25

¶67    The phrase appears once in the people's document--the Montana Constitution. Article VII, Section 8 provides that in the event the governor fails to timely appoint a replacement for a District or Supreme Court vacancy, the Chief Justice shall make the appointment from the same nominees "within thirty days of the governor's failure to appoint." Certainly that constitutional provision can only mean "within thirty days *after* the governor's failure to appoint." No rational person would even hint that the Chief Justice could act during the same period of time the governor was authorized to act. Yet, a refusal to interpret "within 30 days of" as "within 30 days after" results in such a conclusion.

¶68    Moreover, the prepositional phrase "within 30 days of [some occurrence or event]" appears more than 200 times in the Montana Code Annotated. Only a few examples need to be set forth to illustrate the error in the Court's interpretation. Section 2-3-114, MCA, provides that "[t]he district courts of the state have jurisdiction to set aside an agency decision under this part upon petition made within 30 days of the date of the decision[.]" Can this statute really mean, as it does pursuant to the Court's analysis, that a petition can be filed within 30 days before the decision at issue, but not later than 30 days after the decision? Similarly, § 2-3-213, MCA, provides that a suit to void a decision made in violation of § 2-3-203, MCA, must be commenced "within 30 days of the decision." Does this mean that such a suit can be filed in a district court within 30 days before the decision is made, but not later than 30 days after? Surely not!

¶69    Furthermore, the Legislature is fully cognizant of how to set a time parameter which includes a 30-day time period both before and after a specified event. For example, § 1-5-405(3), MCA, requires fees and documents to be submitted "within 30 days before or within

26

30 days after" the effective date of a surety bond. The Legislature did not include this language in § 3-10-231(2)(a)(i), MCA.

¶70 Finally, to the extent the Court believes it is appropriate to rely on a dictionary definition of only one word in the phrase at issue, I recommend it look to a definition for the word "of." The first definition of that word set forth in THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1219 (4th ed. 2000), is "originating at or from." Under this common meaning of the word "of," the only reasonable interpretation of the phrase "within 30 days of taking office" is that a substitute justice of the peace must be designated within 30 days from a justice of the peace taking office, not prior to taking office.

¶71 Judge Guilio's designation of Rennie prior to taking office does not comply with the requirement of § 3-10-231(2)(a)(i), MCA, that a justice of the peace shall provide for a substitute justice of the peace within 30 days of taking office. The search warrant at issue in the present case was not valid because Rennie was not authorized to issue it. For that reason, I would reverse the District Court's denial of Beaupre's motion to suppress and remand for further proceedings consistent with the stated conclusions. I strenuously dissent from the Court's refusal to do so.

/S/ KARLA M. GRAY

Justice James C. Nelson dissents.

¶72 I concur in Chief Justice Gray's dissent. As an aside, this is the third time in the last ten years that this Court has been called upon to interpret § 3-10-231, MCA. *See State v.*

27

*Vickers*, 1998 MT 201, 290 Mont. 356, 964 P.2d 756; *Potter v. Dist. Ct. of 16th Jud. Dist.* (1994), 266 Mont. 384, 880 P.2d 1319. In these cases, the evidence that was seized pursuant to search warrants issued by justices of the peace was suppressed because of a failure to comply with the technical requirements of § 3-10-231, MCA.

¶73    Specifically, in *Vickers*, the acting justice of the peace did not qualify as a judge under § 3-10-231, MCA, because: (1) he failed to create a list of substitutes; (2) the constitutional oath of office was not properly administered; and (3) he failed to satisfy the call-in procedure when he did provide law enforcement officials with a "menu" of substitutes, rather than designating specific justices whom could assume jurisdiction. *Vickers*, ¶¶ 26-29. Further, in *Potter*, we held that marijuana and other drug related evidence seized as a result of search warrants issued by an acting justice of the peace must be suppressed, given that the acting justice of the peace did not qualify as such under § 3-10-231, MCA, because he: (1) did not draw up a list of persons qualified to hold court in his absence within thirty days of his taking office; (2) he did not a obtain a waiver of training from the Commission; (3) he was not sworn as an acting justice of the peace; and (4) another city judge was not asked to serve, although he was capable of so doing. *Potter*, 266 Mont. at 392-94, 880 P.2d at 1324-26.

¶74    In addition to *Vickers* and *Potter* and the discussions contained therein, § 3-10-231, MCA, has been at issue in five separate Attorney General Opinions. All of these opinions have attempted to provide guidance regarding the very complex process of substituting a justice of the peace. *See* 48 *Op. Att'y Gen.* 11 (2000); 43 *Op. Att'y Gen.* 51 (1990); 43 *Op. Att'y Gen.* 49 (1989); 42 *Op. Att'y Gen.* 4 (1987); 40 *Op. Att'y Gen.* 26 (1983). If nothing

28

else, this Court's Opinions in *Vickers* and *Potter*, coupled with those of the Attorney General ought to say something to the legislature regarding the complexity of the process delineated in § 3-10-231, MCA--namely that calling in an acting justice of the peace should not be this difficult.

¶75 Section 3-10-231, MCA, was originally enacted in 1871; it has been amended numerous times, the last in 1997. It is high time that § 3-10-231, MCA, be scrapped and a new statute adopted which simplifies the process and procedure for calling in a qualified substitute justice of the peace. The present statute contains sufficient traps for the unwary and, as here, interpretational issues, to make calling in a substitute justice, at best, risky business. And, as demonstrated by *Vickers* and *Potter*, the consequences of not complying with the statute are severe--i.e., crucial evidence of criminal conduct can be lost.

¶76 In some cases, as the Court's Opinion shows, the actual practice of justices does not conform to what that law actually requires--e.g., some justices do not consult with every judge in every surrounding county in attempting to assess the judge's availability or lack thereof.

¶77 In other instances, what the law requires does not make sense. For example, § 3-10-231(4), MCA, requires that if the justice of the peace is attending a training session, another justice of the peace in the same county is authorized to handle matters that would otherwise be handled by the absent justice. One problem with this language is that *all* limited court jurisdiction judges must complete two mandatory training sessions each year as prescribed by the Commission on Courts of Limited Jurisdiction. *See* § 3-1-1502, MCA; Rule 4 of the

Rules for Courts of Limited Jurisdiction Training and Certification of Judges. In jurisdictions which have two justices of the peace, both justices of the peace, along with the city court and municipal court judges, will all be in the prescribed training at the same time.

¶78   In short, § 3-10-231, MCA, needs to be made a good deal more user friendly and workable than it is now. I join Chief Justice Gray's Dissent.


/S/ JAMES C. NELSON